UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x

MICHELLE LOSCALZO,                           :
                                             :     07 Civ. 3046 (CLB)
                              Plaintiff,      :
                                             :
        -against-                            :
                                             :     FILED VIA ECF
                                             :
                                             :
NEW ROC MOTORCYCLES, LLC,                     :
                                             :
                              Defendant.      :
-------------------------------------------------------------- x

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

BERNBACH LAW FIRM PLLC
245 Main Street, 5th Floor
White Plains, New York 10601
(914) 428-9100
Attorneys for Plaintiff

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Plaintiff's Hire and Tenure as Defendant's Greeter . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Plaintiff's Promotion to Salesperson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.    The Sexual Harassment Suffered By Plaintiff and Her Complaints Thereof . . . . 4

    D.    The Falsity of Defendant's Claim of Poor Performance . . . . . . . . . . . . . . . . . . . 7

    E.    Plaintiff's Advising Defendant of Her Intention to Pursue Legal Action Against It for Sexual Harassment and Her Discharge One Week Later . . . . . . . . . . . . . . . . 14

ARGUMENT
    PLAINTIFF'S CLAIMS OF RETALIATION ARE SUPPORTED BY AMPLE EVIDENCE, THEREBY FORECLOSING SUMMARY JUDGMENT . . . . . . . . . . . . . 16

    A.    Plaintiff's Establishes a Prima Facie Case of Retaliation . . . . . . . . . . . . . . . . . 16

    B.    Defendant's Asserted Reasons Are Pretexts for Retaliation . . . . . . . . . . . . . . . . 23

    C.    Defendant's Retaliatory Interference With Plaintiff's COBRA Rights . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## TABLE OF AUTHORITIES

**Case**                                                                **Page**

Alfano v. Costello, 294 F.3d 365 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Allen v. City of Yonkers, 803 F.Supp. 679
    (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107 (2d Cir. 2004) . . . . . . . . 21, 27

Batka v. Prime Charter Ltd., 301 F.Supp.2d 308
    (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 28

Belfi v. Prendergast, 191 F.3d 129 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Bergin v. Infra-Structures Co., 1996 U.S. Dist. LEXIS 22604
    (E.D.N.Y. Dec. 6, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Carlton v. Mystic Transp., Inc., 202 F.3d 129 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . 24, 25, 27

Chambers v. TRM Copy Ctrs., 43 F.3d 29 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Cifra v. Gen. Elec. Co., 252 F.3d 205 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 22

Clark County Sch. Dist. Breeden, 532 U.S. 268 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Cruz v. Coach Stores, 202 F.3d 560 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Danzer v. Norden Sys., 151 F.3d 50 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

Davis v. City of New York, 228 F.Supp.2d 327
    (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Dominic v. Consol. Edison Co., 822 F.2d 1249 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . 19, 26

Donlon v. Group Health Inc., 2001 U.S. Dist. LEXIS 1001
    (S.D.N.Y. Feb. 8, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

EEOC v. A. Sam & Sons, 872 F.Supp. 29
    (W.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Frankel v. Slotkin, 984 F.2d 1328 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## TABLE OF AUTHORITIES, *(cont'd.)*

**Case**                                                                    **Page**

Ghirardelli v. McAvey Sales & Serv., 287 F.Supp.2d 379
      (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Gordon v. New York City Bd. of Ed., 232 F.3d 111 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 18

Gorman-Bakos v. Cornell Coop. Ext., 252 F.3d 545 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 22

Greene v. New York, 1998 U.S. Dist. LEXIS 7650
      (S.D.N.Y. May 22, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Guglielmo v. Kopald, 2007 U.S. Dist. LEXIS 46558
      (S.D.N.Y. June 26, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

Harris v. Forklift Sys., 510 U.S. 17 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107 (2d Cir. 2004) . . . . . . . . . . . . . . . 21

Hurd v. JCB Int'l Credit Card Co., 923 F.Supp. 492
      (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Lederer v. BP Prods., 2006 U.S. Dist. LEXIS 87368
      (S.D.N.Y. Dec. 1, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

McMenemy v. City of Rochester, 241 F.3d 279 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 16

Miles v. North Gen. Hosp., 998 F.Supp. 377
      (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

Moree v. Frank H. Reis, Inc., 2001 WL 736810
      (S.D.N.Y. June 25, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Peralta v. Cendant Corp., 123 F.Supp.2d 65 (D.Conn. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 25

Purgess v. Sharrock, 33 F.3d 134 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**TABLE OF AUTHORITIES,** *(cont'd.)*

**Case**                                                                    **Page**

Quinn v. Green Tree Credit Corp., 159 F.3d 759 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 17, 22

Ramos v. Marriott Int'l., 134 F.Supp.2d 328
   (S.D.N.Y 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 28

Reed v. A.W. Lawrence & Co., 95 F.3d 1170 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 25

Reeves v. Sanderson Plumbing Prods., 530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . . . . 25

Renaldi v. Mfrs. & Traders Trust Co., 954 F.Supp. 614
   (W.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

Rosen v. Thornburgh, 928 F.2d 528 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

Rui Zhang v. Barr Labs., Inc., 2000 U.S. Dist. LEXIS 6237
   (S.D.N.Y. May 8, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Rule v. Brine, Inc., 85 F.3d 1002 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 20, 27, 28

Tainsky v. Claims USA, Inc., 363 F.Supp.2d 578
   (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Terry v. Ashcroft, 336 F.3d 128 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Passero, 290 F.2d 238 (2d Cir. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

United States v. Thorpe, 484 F.2d 1328 (2d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Vargas v. Chubb Group, 2002 U.S. Dist. LEXIS 46558
   (S.D.N.Y. June 26, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Wallengren v. Samuel French, Inc., 39 F.Supp.2d 343
   (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Plaintiff Michelle Loscalzo ("Plaintiff") respectfully submits this memorandum of law in opposition to the motion of defendant New Roc Motorcycles, LLC ("Defendant") for partial summary judgment.

## STATEMENT OF FACTS

### A.    Plaintiff's Hire and Tenure as Defendant's Greeter

In fall 2005, plaintiff, a schoolteacher and former motorcycle salesperson for BMW,[1] approached defendant's President and part-owner John Meskunas ("Meskunas") to inquire about a part-time position as greeter (Pl. 56.1 Stmt., ¶74). Upon looking her over and pronouncing her "attractive," Meskunas advised plaintiff that she would "do for the job," and following an interview with Meskunas and his wife, defendant's co-owner, during which, among other things, she was quizzed about her knowledge of motorcycles, she was hired for the position, assuming it once the dealership opened for business in November 2005 (*Id.*, ¶¶75, 77-8).

As greeter, plaintiff reported directly to Adrianna Davidson ("Davidson"), a manager and personal friend of Meskunas and his wife,[2] and was responsible, *inter alia*, for welcoming customers to the store, and for showing them the motorcycles for sale when the salespersons were otherwise occupied (*Id.*, ¶¶79, 80, 82). Plaintiff remained as defendant's greeter until about September 2006, and although Meskunas now contends that her performance in that position was poor, her direct supervisor during that extended period of time, Davidson, squarely disagreed, describing plaintiff's performance as greeter as "good." (*Id.*, ¶¶83-4). Specifically, Meskunas contended that plaintiff's performance as greeter was poor because she frequently arrived at work

---

[1] Plaintiff sold motorcycles for BMW for approximately two years (*Id.*, ¶76).

[2] As friends of Meskunas and his wife, Davidson would socialize with them, and in fact, at the time of her deposition, Davidson had been out socially with the Meskunas' just three days earlier (*Id.*, ¶81).

1

late (*Id.*, ¶87). However, Meskunas (a) never reprimanded plaintiff for reporting late; (b) conceded that lateness was a problem with other employees of the store, whose conduct in this regard, though "habitual[]," also precipitated no reprimands from him, facts corroborated by defendant's Sales Manager Wayne Sforza ("Sforza"); (c) stressed that lateness was not a terminable offense at defendant; and (d) admitted that, accordingly, he had never discharged an employee of defendant for lateness, and hence that plaintiff had not ultimately been fired because of lateness, an admission underscored at his deposition by his counsel, and further corroborated by Sforza (*Id.*, ¶¶88-91).[3] Moreover, both Meskunas and Sforza made clear that all matters of significance concerning an employee's performance were to be noted in writing in the employee's personnel file, yet, regarding plaintiff's supposed rampant lateness as greeter, there exists utterly no documentation on that score (*Id.*, ¶¶95-6).[4] In fact, despite defendant's claiming plaintiff's lateness to have been evident throughout her entire tenure with it, and a significant performance failing, there exists but a single documented instance of such (*Id.*, ¶97).

**B.** **Plaintiff's Promotion to Salesperson**

After nine months of supposedly flagrantly deficient performance, defendant not only

---

[3] And though lateness is thus nothing but the reddest of herrings upon this motion, it should still be noted that the time sheets relied upon by defendant to "establish" plaintiff's instances of alleged lateness merely recorded when she punched in on the store's time clock, not necessarily when she actually arrived at the premises, which is a significant distinction given that plaintiff explained – without dispute - that she often did not punch in immediately upon entering the store, due to the need to tend right away to customers (*Id.*, ¶92). As a result, plaintiff was nowhere near as late as defendant alleges, a fact confirmed by defendant's former Finance and Insurance Manager Tony DeSimone ("DeSimone"), second-in-charge of the sales department, with direct supervisory authority over plaintiff when Sforza was absent, who testified, as plaintiff did, that plaintiff was ordinarily on time (*Id.*, ¶¶93-4).

[4] Meskunas also asserted that plaintiff's performance as greeter was poor because she often came to work hung over (*Id.*, ¶87). Yet, although he claims to have personally observed plaintiff in such a state upwards of ten times, not only is such disputed by plaintiff, but, as with Meskunas' general claim of poor performance by plaintiff as greeter, this contention was specifically controverted by her direct supervisor, Davidson, who stated categorically that plaintiff had never as greeter shown herself to have been hung over (*Id.*, ¶¶98-100). In fact, Davidson went so far as to say that, while she had never seen plaintiff hung over at work, among the rest of defendant's employees, coming in hung over was a common occurrence (*Id.*, ¶101). And plaintiff was never written up for her supposed repeated instances of working while hung over (*Id.*, ¶102).

2

failed to terminate plaintiff at any point during that time for her alleged flood of failings, but actually saw fit, in September 2006, to *promote* her, to salesperson, a full-time position in which the very lifeblood of defendant's business was not only entrusted to her, but entrusted to her to an exceedingly substantial extent, given that, with one of defendant's two salespersons out at that time on an extended medical leave, plaintiff would comprise fully one-half of defendant's sales force (*Id.*, ¶105). Moreover, at the time of plaintiff's promotion, Meskunas had been searching for a number of months for a salesperson, but had repeatedly rejected applicants for the post as unsuitable, thereby demonstrating both the exacting standards he applied to the effort to fill that most critical position, and that plaintiff had, given his willingness to hire her therefor, obviously met them (*Id.*, ¶106).[5] Also demonstrating his confidence in her for the position, Meskunas both dismissed Sforza's objection to Meskunas' intention to promote plaintiff, telling Sforza that he believed plaintiff a good candidate for the position, and went out of his way to persuade her to accept the job, by assuring her that in it she could expect to earn, in salary and commissions, in excess of her teacher's compensation (*Id.*, ¶¶107-8).

C.    **The Sexual Harassment Suffered By Plaintiff and Her Complaints Thereof**

From the outset of her employment with defendant as greeter and continuing on through her time as one of its salespersons, plaintiff was subjected to a campaign of sexually harassing comments and actions by Meskunas, such conduct including Meskunas' (a) ogling plaintiff and commenting lasciviously upon her "tits" or "boobs" and "ass";[6] (b) drawing a link between the

---

[5] Such was hardly surprising in light of plaintiff's above-discussed experience for a number of years as a motorcycle salesperson for BMW, her provision of sales support to the sales staff at defendant in her time as greeter, and the fact that, as mentioned above, prior to her hire as greeter, plaintiff's knowledge concerning motorcycles had been specifically explored with her by Meskunas and his wife, to their obvious satisfaction (*Id.*, ¶¶76, 78, 82).

[6] Meskunas' remarks in this regard encompassed: "You have great tits"; "Great ass"; "You have the best ass in the place"; "Michelle, you have bigger boobs than Adri[anna Davidson]" (*Id.*, ¶110; *see also* n. 7, 8, 10, *infra*). Also on the subject of her anatomy, Meskunas once inquired of plaintiff as to the color of her pubic hair, asking her,

3

size of plaintiff's breasts and her prowess as a salesperson;[7] (c) after looking her up and down,

"thanking" plaintiff for wearing certain clothes that he believed accentuated her breasts and/or

buttocks;[8] (d) repeatedly asking plaintiff to sit on his lap, such often being his response when

plaintiff approached him for his assistance with work-related issues;[9] (e) asking plaintiff on many

occasions to hug him, and in a number of instances unwelcomely wrapping his arm around her;

(f) announcing to the store that he had hired plaintiff for her "tits";[10] (g) propositioning plaintiff

to accompany him on a business trip that his wife would not be taking with him and for which

plaintiff's presence would serve no business purpose; (h) simulating a sex act while he and

plaintiff sat together on a motorcycle;[11] (i) declaring that plaintiff "looked hot on" another

motorcycle upon which she was sitting and uninvitedly attempting to squeeze onto the seat with

---

"Does your carpet match your drapes?" (Pl. 56.1 Stmt., ¶111).

[7] On an occasion in which a customer left the dealership without buying a motorcycle, Meskunas remarked to plaintiff, "With tits like that you should be able to sell ice to an Eskimo." (*Id.*, ¶113). In another instance, in Davidson's presence, Meskunas opined that plaintiff's breasts were large and because of their size, she should be able to do her job very well (*Id.*).

[8] On this score, Meskunas' "observations," offered virtually as a matter of habit whenever he or plaintiff entered the store, and frequently in front of customers and other employees, included: "Thanks for wearing that, it shows off your tits" or "boobs"; "You have great boobs, thanks for wearing that"; "Thanks for wearing those jeans, you have a great ass"; "Thanks for wearing that. You have a great ass, those are nice jeans"; "Thanks for wearing that today, you look sexy." (*Id.*, ¶114).

[9] Frequently, when plaintiff would come to him in such instances, Meskunas would respond, "Come here, baby, come sit on my lap and tell me all about it." (*Id.*, ¶¶115-16). In another incident, witnessed by Human Resources Manager Patricia Massa ("Massa"), Meskunas, seated on the stairs between the store's main and upper levels, summoned plaintiff over, saying, "I need to speak to you,"and when plaintiff approached, instead of imparting to her something of a business or otherwise legitimate nature, he continued, "Come, baby, sit on my lap." (*Id.*, ¶117).

[10] To commemorate defendant's Customer Appreciation Day, Meskunas entered the dealership and, referring to a vendor outside selling baseball cards, advised the entire store: "You know what? That guy just asked me why I hired Mikki [plaintiff's nickname]. I said, 'Because she's got nice tits.'" (*Id.*, ¶119).

[11] Upon receiving a new motorcycle at the dealership, Meskunas, seated on it near the entrance to the store, asked plaintiff to sit on it with him, ostensibly so she could convey to him how the seat felt for a passenger. Once seated with him, however, and in full view of numerous customers and members of his staff, Meskunas said, "Oh yeah, Mikki, almost there," and began to rock back and forth as if engaged in sexual intercourse, his body grinding up against plaintiff's, while making moaning and groaning sounds and intoning "Don't stop, don't stop, I'm almost there, keep going," and "Wow, that feels good." (*Id.*, ¶121).

her; and (j) demeaningly commanding plaintiff to perform such menial tasks as watering the plants, cleaning desks or fetching him a drink because she was "the girl"and that, as such, was her "job" (*Id.*, ¶¶109-24). Though Meskunas frequently subjected plaintiff to the foregoing abuse when it was just the two of them present, he also, as alluded to above, engaged in such behavior before others, and certain of those individuals, namely DeSimone, Meskunas' personal friend Davidson, and customer Albert Griffo, have come forward herein to corroborate many of plaintiff's allegations, and thereby contradict Meskunas' denials of ever having conducted himself in the sexually harassing manner described above (*Id.*, ¶124).

On numerous occasions throughout her employment with defendant, both as greeter and salesperson, plaintiff registered complaints about the foregoing sexually harassing behavior with Massa, who, by virtue of her position of Human Resources Manager, as well as under defendant's sexual harassment policy, was designated to receive and investigate complaints of that nature (*Id.*, ¶126). In complaining to Massa, plaintiff conveyed to her the details of the conduct to which she was objecting (or recounted them, as Massa had personally witnessed certain instances of that conduct), and that such conduct was unwelcome, offensive and sexually harassing (*Id.*, ¶127).[12] And as discussed below, plaintiff ultimately -- and most tellingly, but one week before she would be terminated – advised Massa that she was going to seek legal counsel to explore her rights and the matter of enforcing them on account of the sexual harassment she had suffered at defendant (*Id.*, ¶130). Of course, Massa now denies having ever received any of the numerous complaints plaintiff avers she registered with her, just as she denies ever witnessing or otherwise learning of the types of behavior that was the gravamen of those complaints (*Id.*,

---

[12] In addition, plaintiff made it abundantly clear to Meskunas that she objected to his sexually harassing conduct, such as when, in response to Meskunas' simulating a sex act with her on the back of a motorcycle, she promptly leapt off the bike, declared to him, "You're disgusting," and walked away (*Id.*, ¶128).

¶131), denials that not only at the very least give rise to a genuine dispute of surpassingly

material fact, but are exceedingly hard to swallow, given that, to do so, one would have to accept

that, with Meskunas' sexually harassing conduct so rampant that one-quarter of defendant's

management team at the time – as well as a *customer* – have come forward herein to attest to

their awareness at that time of the plague of such conduct,[13] such nevertheless managed to totally

escape the one manager specifically charged with having her antennae up to detect such conduct

(*Id.* & ¶¶124, 126, 133). Moreover, plaintiff's account of having lodged repeated complaints with

Massa is bolstered by DeSimone, who testified that plaintiff advised him contemporaneously

with certain of those complaints – and hence, well before the advent or even specter of the instant

lawsuit – that she had so complained (*Id.*, ¶132).[14]

## D.    The Falsity of Defendant's Claims of Poor Performance

Once in the position of salesperson, plaintiff applied herself to selling defendant's

motorcycles and performed well in this regard, despite a series of obstacles thrown in her path

that were clearly meant to ensure her failure (*Id.*, ¶¶138-45, 147-49, 152-53).[15] In the first place,

---

[13] Other than the Meskunas', defendant's management team consisted of Sforza, Massa, DeSimone, Davidson and her co-clothing manager Doreen, the service manager, the parts manager and Claudia Raptis, the administrative manager (*Id.*, ¶133). Davidson testified that Meskunas would "regularly" make sexually inappropriate comments in the store, mostly to plaintiff, but to other women as well, and DeSimone testified that Meskunas had engaged in such conduct "so many times," perhaps even as many as fifty (*Id.*, ¶¶134, 135).

[14] This evidence is itself bolstered by the fact that DeSimone also testified to having received from plaintiff contemporaneous confirmation of her complaints to Meskunas regarding Sforza's below-discussed penchant for misappropriating commissions she had earned, complaints that defendant concedes she made (*Id.*).

[15] Although nowhere in its discussions in its brief and Local Rule 56.1 Statement of its allegedly legitimate reasons for firing her does defendant contend that plaintiff was terminated for not selling enough motorcycles, in his affidavit herein Meskunas alleges that plaintiff sold only nineteen motorcycles during her term as a salesperson (*Id.*, ¶137), and in so doing substantially misrepresents that figure, as shown, first, by lists maintained by plaintiff of just some of the customers to whom she sold motorcycles, which lists include twenty-nine such clients; by a company document that reveals two more such customers; and by plaintiff's recollection during her deposition of four more, as well as of another to whom she made a sale, but to whom she did not actually deliver the motorcycle in question, due to her having been terminated before the delivery date, for a total of at least thirty-six sales (*Id.*, ¶138). Second, plaintiff was consistently denied credit for sales she had made, by virtue of Sforza's repeatedly commandeering deals

as Sales Manager and her direct supervisor, it was Sforza's obligation to provide training to

plaintiff as a sales trainee, and especially one who had no history selling Harley Davidsons, yet,

as attested to by DeSimone, Sforza refused to discharge this crucial obligation, engaging in

utterly no training of plaintiff – a circumstance of which Meskunas, in exercising supervisory

authority over both Sforza and plaintiff, undoubtedly was aware (*Id.*, ¶¶141, 143, 145).[16] Though

defendant now upon this motion degrades plaintiff's knowledge of Harley Davidson motorcycles,

such was fully known to defendant when promoting her to the salesperson position, and was thus

the impetus not only for its wholly shirked charge to Sforza that he train her, but for Meskunas'

instruction to her that, should a customer make an inquiry on a technical matter that plaintiff was

not able to answer, she was to refer the customer to the service manager (*Id.*, ¶146). Even worse,

and in an utter inversion of the evidence that is emblematic of the process by which defendant

arrives at much of its "proof" of plaintiff's alleged poor performance, defendant claims herein

that a major deficiency of hers was her "refusal" to complete a number of online training courses

on various technical aspects of Harley Davidsons, when in fact plaintiff's failure to complete

those courses was additional evidence of the virtual total lack of support she received from

defendant when she was supposed to be training as a salesperson. Specifically, completion of the

courses in question required certain materials not available online, *e.g.* workbooks, reference

sources and CDs, and though plaintiff repeatedly requested such materials from defendant, she

---

from her so as to keep the commissions involved for himself, and although some of these instances were corrected by Meskunas, many were not, which needless to say skewed plaintiff's sales record, in that sales she in fact made were not credited to her (*Id.*, ¶139). Particularly illustrative of Sforza's deceit in this regard was his claiming categorically that a customer named Mark Rios ("Rios") was at all times his exclusive customer, and thus never plaintiff's, before then being confronted with an affidavit from Rios stating that he had in fact bought his motorcycle not from Sforza, but from plaintiff (*Id.*, ¶140).

[16] Sforza withheld not only training from plaintiff, but access to basic sales-related information such as defendant's inventory lists (*Id.*, ¶142).

7

was never provided with them, thereby necessarily – and by absolutely no fault of her own –

precluding her completion of the courses in question (*Id.*, ¶147).[17] Even so hamstrung, plaintiff,

as personally observed by DeSimone, nevertheless performed the online training, and according

to DeSimone – again, second-in-charge of the sales department, and thus in a position to know –

though sometimes without certain technical information that she was denied by virtue of the

above and by Sforza's refusal to train her, overall plaintiff knew defendant's product (*Id.*, ¶¶94,

148-49). Confirming this was Meskunas' inability, in contending that plaintiff was wont to

furnish customers with erroneous information about defendant's motorcycles, to provide more

than a single example of such – an example that, in fact, was no example at all, as the instance in

question was one in which the purveyor of inaccurate information about a motorcycle was not

plaintiff, but Meskunas himself (*Id.*, ¶150). Specifically, Meskunas claimed that plaintiff had

advised a customer that a particular motorcycle came equipped with a Global Positioning

System, when in fact it did not – only, it was not plaintiff who imparted this erroneous

information, but *Meskunas*, with plaintiff's involvement in the episode restricted to calling the

customer at Meskunas' direction to correct his error (*Id.*, ¶151). Moreover, plaintiff was well

regarded by her customers, as evidenced by her high customer service ratings, her receipt of gifts

and letters of appreciation from satisfied customers of hers, and by positive reviews of her sales

skills that customers imparted to Davidson, who testified that she heard from a number of

customers that they "really liked" plaintiff as a salesperson, for a variety of reasons, including,

quite notably, her product knowledge (*Id.*, ¶152). And again, despite it being defendant's practice

to document all significant performance failings, there exists no documentation whatsoever

---

[17] In stark contrast to plaintiff's experience upon assuming her salesperson's position, when DeSimone joined defendant, Sforza trained him on the use of both defendant's and Harley Davidson's computer systems, and DeSimone was sent at defendant's expense to off-site training from Harley Davidson (*Id.*, ¶144).

condemning plaintiff's alleged lack of technical knowledge, her supposed "refusal" to complete

certain online courses, or the nature or results of her sales efforts (*Id.*, ¶153).

What defendant has documented, however, is the primary source from which it draws the

allegedly legitimate, non-retaliatory reasons for plaintiff's termination. In its discussion in its

brief of the alleged grounds for plaintiff's discharge (Def. Mem. at 16-20), defendant enumerates

nine such grounds, every single one of which readily demonstrably false. In the first place, and

perfectly heralding the fiction to come, it points to plaintiff's alleged excessive lateness, a blatant

falsehood, given, as discussed above, the specific disavowal by it and its counsel of lateness as a

reason for plaintiff's dismissal (Pl. 56.1 Stmt., ¶91). Defendant next proffers plaintiff's "refusal"

to complete certain training courses, which, as also shown above, was nothing of the sort, but

was, quite to the contrary, with plaintiff having repeatedly sought and repeatedly been denied

various materials required for completion of those courses, an element in the larger refusal of

*defendant* to afford her the sales training it recognized as due her (*see* pp. 6-8, *supra*).

Next, defendant relies on a series of instances in which plaintiff allegedly acted

improperly, resulting in the issuance of disciplinary memoranda, such as the one on September

21, 2006, wherein plaintiff was cited for "insubordination" for delivering a motorcycle to a

customer while Sforza was not at work. However, though Sforza may have instructed plaintiff

not to deliver the motorcycle in question without him present, any such instruction was fully

countermanded by Meskunas' direction to plaintiff to make the delivery – direction that

Meskunas imparted to plaintiff quite emphatically, telling her, " I am the owner, you do as I tell

you." – a fact with which Sforza agreed (Pl. 56.1 Stmt., ¶154).[18] The utterly bogus nature of this

---

[18] Sforza conceded that he wrote plaintiff up for this "infraction" without knowing whether Meskunas had
directed plaintiff to deliver the motorcycle, as plaintiff asserts he most certainly did (*Id.* & ¶156)

"incident" is confirmed by the fact that when, two months later, the exact same situation arose in connection with the delivery of another motorcycle to another customer, with Sforza again instructing plaintiff not to deliver the bike while he was away, and Meskunas again disagreeing, telling plaintiff to effect the delivery, plaintiff again delivered the motorcycle in Sforza's absence and no disciplinary memorandum resulted (*Id.*, ¶157).[19]

Highly evocative of the foregoing as a flagrant and knowing sham are the circumstances underlying the December 20, 2006 write-up also relied upon by defendant, in which plaintiff was cited for "disregard[ing]" certain "policies and procedures." (*Id.*, ¶158). Although the nature of plaintiff's "violation" is not specified in the document, and while Sforza claimed not to recall the impetus for the write-up, plaintiff did, testifying that it came as the result of her having noted her deals on the deal board in DeSimone's office (*Id.*). Sforza objected to this, erased them from the board and issued the memorandum against plaintiff – again, as with the above-discussed motorcycle-delivery incident, without knowing whether plaintiff had been expressly instructed by Meskunas to take the action in question, which she most certainly had (*Id.*, ¶159).[20] And after initially contending ridiculously that plaintiff should have followed his direction instead of Meskunas', Sforza conceded that that was not in fact the case (*Id.*, ¶161).

Perhaps the most astounding claim of poor performance by plaintiff derives from a January 5, 2007 warning she was issued for allegedly "fail[ing] to properly log [a customer's] deposit." (*Id.*, ¶162). In explaining the proper procedure for processing deposits, Meskunas made

---

[19] Meskunas and Sforza were frequently in conflict as to what actions plaintiff should or should not take, and Meskunas left no doubt for plaintiff as to what the proper course was in those instances, telling her in no uncertain terms that, in such cases, plaintiff was to listen to him and not Sforza (*Id.*, ¶155).

[20] After Sforza erased her deals from the board and plaintiff went back to Meskunas to confirm his instruction, Meskunas was incredulous, saying to plaintiff, "Well, put them up again. How am I supposed to know what deals are pending?" (*Id.*, ¶160). Plaintiff did and was disciplined by Sforza (*Id.*).

clear that a deposit must be recorded in either the "deal folder" or on the company's computer system (*Id.*, ¶163). And in accusing plaintiff of having failed to properly record the deposit in this particular instance, Meskunas contended that she had neglected to make note of it in either of the above-discussed ways (*Id.*, ¶164). Yet, in the very document citing plaintiff for this "failing," it is stated that plaintiff had indeed placed a record of the deposit (in the form of a credit-card receipt) in the deal folder, *exactly* as company procedure required – a fact confirmed by defendant in its brief, wherein it states that "the customer's deposit receipt was eventually located in the deal folder," or, in other words, *precisely* where it was supposed to be (*Id.*, ¶165).[21] Moreover, plaintiff also properly recorded the deposit on the company's computer: by running the deposit payment through the dealership's credit card machine, the payment was automatically entered in the company's daily "batch report," a record of all credit-card transactions occurring in the store each day that was maintained by Raptis, and indeed right upon the credit-card receipt that plaintiff had per procedure placed in the deal folder is noted the batch number for the transaction (*Id.*, ¶166). Not surprisingly then, after accusing plaintiff of having failed to properly record the deposit in either the deal folder or on the company computer, Meskunas conceded that in fact he did not know if she had actually failed to record the deposit in either of those venues (*Id.*, ¶169).

As for the January 27, 2007 citation of plaintiff for allegedly "failing to disclose information relevant to a motorcycle trade-in," defendant claims that plaintiff deliberately failed to disclose that the customer had withdrawn the trade-in from the transaction for an unsuccessful attempt to sell it on eBay, when in fact plaintiff had never been advised that the bike had been removed from the transaction, to sell on eBay or for any other reason, and thus could not have

---

[21] Sforza, the author of the memorandum, confirmed that the deposit was memorialized in the deal folder (*Id.*, ¶168).

11

willfully withheld such information from Meskunas (*Id.*, ¶¶170-71). The customer in question

had placed a deposit on a particular motorcycle several months before the motorcycle came into

the dealership, and had based the amount of the deposit on the trade-in value he was quoted at

the time (*Id.*, ¶172). During the several-month lag between placement of the deposit and the

arrival of the motorcycle, the customer never, as Meskunas asserts, withdrew the trade-in from

the transaction, as evidenced by the fact that he had during that time neither retracted the deposit

he had specifically calculated on the basis of the trade-in nor advised plaintiff that he was

removing the trade-in from the transaction, even as he apparently, and unbeknownst to plaintiff,

sought to sell the trade-in bike on eBay, thereby affording plaintiff no indication of anything

other than that the circumstances extant at the inception of the transaction persisted at the time of

its culmination (*Id.*, ¶173). Thus, when the customer returned to complete the transaction, and

Sforza quoted him a lower trade-in price, plaintiff genuinely viewed this an arbitrary reduction

that did not reflect the original terms of the deal and thus jeopardized the deal (*Id.*, ¶174). Even

though the customer's attempt to sell the trade-in bike on eBay eventually came to light, that did

nothing to change the state of the information under which plaintiff was operating when she went

to Meskunas to seek enforcement of the original terms of the deal, so that she could not have

"lied" to Meskunas on this score (*Id.*, ¶175). Although plaintiff explained all of this to Meskunas,

and while he ultimately took action on the deal that clearly evidenced an acceptance of plaintiff's

account, namely approving the original trade-in price plaintiff had quoted, he nevertheless wrote

up a false charge against her for having "lied" to him (*Id.*, ¶176). Even more egregious was

Meskunas' second claim of "dishonesty" by plaintiff, as set forth in a February 4, 2007 warning

and arising from her alleged sale of a motorcycle without disclosing to the customer that the front

fender had been repainted, given that plaintiff not only was not the one to make that sale – Sforza

was – but she was not even present at the store that day, having been out sick (*Id.*, ¶177).

Also starkly demonstrating the total bankruptcy of defendant's claim of poor performance is its resort to dressing up an eminently petty episode of Sforza's displeasure over plaintiff's failure to return a chair she had borrowed from his office into an ominous-sounding "failure to follow proper procedure." (Def. Mem. at 19).[22] The utter inconsequentiality of this matter is not only demonstrated on its face, but by the fact that no disciplinary memoranda exist in regard thereto (*Id.*, ¶179). Moreover, decidedly minor though it was, this occurrence is in fact further illustration of the lack of support plaintiff received from defendant as a salesperson, in that, though she as a salesperson was expected to meet with customers at her desk, she, unlike everyone else in the store, did not have chairs at her desk for that purpose, despite her months-long requests for chairs from both Sforza and Meskunas (*Id.*, ¶180). And although defendant characterizes this matter as indicative of her alleged penchant for "continuously antagoniz[ing]... Sforza and repeatedly refus[ing] to obey his direct instructions" (Def. Mem. at 19), not only was it shown above that the cited instances of plaintiff's supposedly defying Sforza's commands were known full well by defendant to have been instances in which plaintiff was properly *following* the contrary instructions of Meskunas, but defendant was also fully aware that it was Sforza who antagonized plaintiff, as confirmed by Massa, who admitted that, with respect to his treatment of plaintiff, Sforza had been "counseled on his management skills" and plaintiff's "complaints [about his management of her] were addressed very seriously." (Pl. 56.1 Stmt., ¶181).[23]

---

[22] Defendant frames this matter as an alleged violation by plaintiff of a directive from Sforza "not to remove items from either the business manager's or the sale[s] manager's office" (Pl. 56.1 Stmt., ¶178). However, this is wrong, as Sforza conceded that plaintiff was in fact authorized to borrow the chairs (*Id.*).

[23] Defendant also relies on a September 3, 2006 warning for lateness on plaintiff's part, but as made clear repeatedly herein defendant has expressly disclaimed lateness as a reason for plaintiff's discharge (*Id.*, ¶182). However, it is worth noting that this warning also cites plaintiff for having arrived at work without "appropriate business attire," a reference to her having worn sneakers into the store with the pair of shoes she planned to change

**E.    Plaintiff's Advising Defendant of Her Intention to Pursue Legal Action
Against It for Sexual Harassment and Her Discharge One Week Later**

As mentioned above, after registering numerous complaints with Massa about the sexual

harassment Meskunas constantly directed at her, in late January 2007, plaintiff advised Massa

that she was going to consult a lawyer to explore her rights and the matter of enforcing them

against defendant on account of Meskunas' conduct (*Id.*, ¶185).[24] Approximately one week later,

on February 8, 2007, Meskunas and Massa informed plaintiff of the decision that they, along

with Sforza, had reached, namely that she was being terminated, with Meskunas proffering as the

cause for the discharge none of the litany of "reasons" defendant now presses, but rather merely

the observation that "it just didn't work out." (*Id.*, ¶¶187-88). In response, plaintiff stated that

half of it was her fault, and while defendant now seeks to cast this remark as a smoking-gun

admission by her to the virtual crime wave of poor performance of which she is currently

accused, it does so by as usual wholly ignoring plaintiff's testimony on the matter, whereby she

explained that the comment had nothing to do with her performance, but rather referred to her

regret that she had not stood up for herself more forcefully in the face of Meskunas' sexual

harassment and Sforza's various shenanigans (*Id.*, ¶189). In fact, during the meeting it was Massa

who remarked in a way that indicated the *falsity* of defendant's current claims of poor

performance, volunteering that she would be "happy" to give the allegedly abysmally performing

plaintiff "a good recommendation for another job" if she needed it (*Id.*, ¶190).

Less than two weeks later, by letter dated February 20, 2007, plaintiff's counsel advised

---

into in her hand (*Id.*, ¶183). That defendant's proffer of this warning as proof of the legitimacy of plaintiff's
discharge is contrived is further shown by Meskunas' admission that plaintiff's conduct in regard to her footwear in
this instance was "perfectly acceptable." (*Id.*, ¶184).

[24] In fact, plaintiff had already met with an attorney for those purposes (right before approaching Massa in
this regard), but had taken the above tack with Massa because plaintiff was not sure she could trust Massa with that
information (*Id.*, ¶186).

defendant that plaintiff intended to sue it for sexual harassment (*Id.*, ¶191). Then, on February

23, because she considered Massa a friend, plaintiff called Massa to tell her personally of her

intention to sue defendant, before she found out from Meskunas (*Id.*, ¶192). However, having

been the one to first read the letter from plaintiff's counsel – which letter she brought

immediately to Meskunas' attention – Massa *had* already found out, which prompted plaintiff to

apologize to her in an e-mail later that same day "for not telling you sooner," a self-evident

reference to what Massa had learned by way of the letter, that plaintiff had actually decided to

pursue legal action against defendant, and not in any way, as defendant twists it in total disregard

of the surrounding circumstances and plaintiff's clear and categorical explanation, as indicating

that this was the first time ever that plaintiff had apprised Massa of Meskunas' sexual harassment

of her (*Id.*, ¶193). In fact, what the exchange of e-mails between plaintiff and Massa that

thereafter ensued demonstrates is the reason why Massa is now lying about having received

complaints from plaintiff and observed Meskunas' unlawful conduct toward her, namely self-

preservation, as encapsulated in her admonition to plaintiff that, in "going after a small business

owner," she "ha[s] put my job and everyone else's here in jeopardy." (*Id.*, ¶194).

## ARGUMENT
## PLAINTIFF'S CLAIMS OF RETALIATION ARE SUPPORTED BY
## AMPLE EVIDENCE, THEREBY FORECLOSING SUMMARY JUDGMENT

### A.    Plaintiff Establishes a Prima Facie Case of Retaliation

In order to establish a prima facie case of retaliation, a plaintiff must demonstrate "(1)

that she engaged in protected participation or opposition under Title VII, (2) that the employer

was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4)

that a causal connection exists between the protected activity and the adverse action." Cifra v.

Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001). Complaints of discriminatory treatment to

management, and specifically to the employer's human resources official, constitute protected activity, Cruz v. Coach Stores, 202 F.3d 560, 566 (2d Cir. 2002); Donlon v. Group Health Inc., 2001 U.S. Dist. LEXIS 1001, *6-7 (S.D.N.Y. Feb. 8, 2001), and of course that is exactly the avenue plaintiff took herein, registering on numerous occasions complaints about Meskunas' conduct toward her with defendant's Human Resources Manager Massa (who, for good measure, was also denominated under defendant's sexual harassment policy an appropriate recipient for complaints of that nature) that set forth for Massa the conduct to which plaintiff was objecting, the fact that such conduct was unwelcome and offensive to plaintiff, and plaintiff's belief that such conduct amounted to sexual harassment, so that it is unquestioned that plaintiff engaged in protected activity, Id. (Complaint to human resources officer outlining supervisor's sexually offensive comments and actions constituted protected activity).[25] And in fact, plaintiff went even further, substantially elevating the urgency of her complaints to Massa, and thus expanding the scope of her protected activity, by ultimately advising Massa that she intended to consult a lawyer for the means of exploring the pursuit of legal action against defendant on the basis of Meskunas' sexual harassment. Cifra, 252 F.3d at 217 (Advising employer of retention of counsel to press discrimination claims protected activity); Quinn v. Green Tree Credit Corp., 159 F.3d

---

[25] While the plaintiff's complaints "need not have actually amounted a violation of Title VII," McMenemy v. City of Rochester, 241 F.3d 279, 283 (2d Cir. 2001), still must "must have had a good faith, reasonable belief that the underlying actions of the employer violated the law," Id. Defendant mounts no challenge to plaintiff's claims on the grounds of the objective and subjective character of her complaints, and for good reason: in objecting to the highly sexually offensive and incessantly inflicted conduct delineated at pp. 3-5, supra, plaintiff was without doubt protesting behavior by Meskunas that was not just arguably, but undeniably both "severe" and "pervasive," the alternative bases for establishing that the complained-of conduct had fostered a hostile working environment, Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002), thereby demonstrating the reasonableness of her belief in the unlawfulness of that conduct. As for the subjective element, the Supreme Court has held that "[t]he effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive," Harris v. Forklift Sys., 510 U.S. 17, 23 (1993), and with Meskunas' harassment of plaintiff having fomented in her significant psychological harm, as evidenced by such harassment's having caused her to (a) submit to counseling, (b) develop depression and certain physical manifestations of her distress such as gastric ailments, and (c) be prescribed various medications to contend with its effects (Pl. L.R. 56.1 Stmt., ¶198), plainly she harbored as well the necessary subjective belief in the illegality of Meskunas' actions toward her.

759, 769 (2d Cir. 1998)(Notifying defendant of intention to pursue legal action against it for sexual harassment protected activity). Of course, it being axiomatic that "[a]ssessments of credibility and choices between conflicting versions of events are matters for the jury, not for the court on summary judgment," Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996), that Massa denies having received any complaints from plaintiff is of no moment as a ground for granting defendant's motion, Tainsky v. Claims USA, Inc., 363 F.Supp.2d 578, 584-85 (S.D.N.Y. 2005) (Where plaintiff asserts she complained of sexual harassment to human resources and defendant denies such, "[r]esolution of that issue... must abide a trial"). In fact, given that, "[i]n ruling on a motion for summary judgment, the district court is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment," Rule, *supra*, for purposes of this motion, Massa's denials of having received plaintiff's complaints are a total nullity, as it must be accepted that plaintiff's protests to Massa, as well as her notice to Massa of her intent to seek legal advice, did occur.[26]

Defendant next contends that a supposed lack of knowledge on Meskunas' part of plaintiff's complaints and intention to pursue legal action against defendant precludes plaintiff's

---

[26] Such a conclusion is not merely a matter of legal nicety restricted to this motion, as a jury would have far more cause to credit plaintiff's account on this score over Massa's. First, that plaintiff complained to Massa is corroborated by DeSimone, a wholly disinterested third-party witness who has testified that plaintiff advised him at a time contemporaneous with such complaints – and thus well before any litigation herein – that she had registered them. As DeSimone also testified to plaintiff's contemporaneous confirmation to him of her complaints to Meskunas regarding Sforza's stealing her commissions, and as defendant has admitted that plaintiff did register such complaints, the inference may clearly be drawn that, when advising DeSimone of complaints she had made, plaintiff had in fact made those complaints. Second, Massa's credibility on this matter is severely undercut by her having revealed a motivation for her to deny falsely that plaintiff had complained to her, namely her fear that plaintiff's case would result in such severe financial hardship for defendant that she would lose her job as a consequence. Finally, the sole "ground" that defendant advances as supposedly bolstering Massa's account is an utter fabrication that fails completely to account for the evidence exposing it as such. Specifically, defendant claims that plaintiff's apologizing to Massa in an e-mail for "not telling [her] sooner" was an admission by plaintiff of never having registered any complaints of sexual harassment. Yet, as discussed earlier, that statement came in the context of plaintiff's attempt to advise Massa before anyone else did of her intention to sue defendant, and it was that intention, and that intention alone, and hence not the underlying fact that Meskunas had been relentlessly harassing her, that plaintiff was apologizing to Massa for not having told her sooner – and defendant knows this.

establishment of the second prong of her prima facie case. However, to credit this contention one must disregard a wide swath of contrary facts and law, beginning with the well-established principle that, at the prima facie stage, all that is required "to satisfy the knowledge requirement... is... general corporate knowledge that the plaintiff has engaged in protected activity," Gordon v. New York City Bd. of Ed., 232 F.3d 111, 116 (2d Cir. 2000), which knowledge of course resided in Massa by virtue of plaintiff's complaints to her.

Beyond that stage, defendant has willfully failed to acknowledge what courts in this circuit routinely have, namely that retaliation may still be shown "even if [a decisionmaker] denies direct knowledge of plaintiff's protected activities,... so long as the jury finds that the circumstances evidence knowledge of the protected activities." *Id.*, at 117. Thus, the Second Circuit, in Rosen v. Thornburgh, 928 F.2d 528, 534 (2d Cir. 1991), rejected the defendant's assertion that a retaliation claim could not be sustained because the decisionmaker allegedly lacked knowledge of the plaintiff's protected activity, on the ground that "[t]here were numerous occasions for" those who did know of the protected activity "to mention to [the decisionmaker] that [the plaintiff]... had complained." Such is exactly the case herein, where occasions on which Meskunas would logically have been advised of plaintiff's complaints against him abound. In the first place, and most basically, it is simply inconceivable that Massa, in receipt of numerous complaints of egregious and unlawful behavior against Meskunas, and then of an indication of possible legal action against the company on account of that behavior, would not have advised the individual at the center of that gathering storm – who was also her boss and the President of the company – of those developments. Given that, "[i]n the fact finding process the trier is authorized to draw reasonable inferences from known or proven facts" where the inference is "one that springs readily and logically to mind," Frankel v. Slotkin, 984 F.2d 1328, 1335 (2d Cir.

**18**

1993), the facts delineated above unquestionably inhere with the force of logic that compels the

conclusion that Massa advised Meskunas of plaintiff's complaints and intention to explore legal

action. Such is borne out by the Second Circuit's decision in <u>Dominic v. Consol. Edison Co.</u>, 822

F.2d 1249, 1255 (2d Cir. 1987), wherein the court rejected the defendant's putatively exculpatory

posit of the decisionmaker's alleged lack of knowledge of the plaintiff's protected activity, on the

ground that since the plaintiff "testified that he had told [the decisionmaker's] assistant... of his

intention to file a complaint,... the jury could have inferred that word of his intention reached [the

decisionmaker]."[27] The irresistibility of the foregoing logic is further confirmed by the fact that,

upon receiving from plaintiff's counsel a threat of legal action on the basis of Meskunas' sexual

harassment, Massa admittedly – and as confirmed by Meskunas – acted wholly pursuant to that

logic and went directly to Meskunas with the news (Pl. L.R. Stmt., ¶¶61(c), 193). Even if not

prodded by logic and common sense to inform Meskunas of plaintiff's complaints, Massa was

absolutely *mandated* to do so by defendant's sexual harassment policy. With the policy flatly

providing that "a thorough, objective investigation will be undertaken" into complaints of sexual

harassment, upon receiving plaintiff's numerous complaints of sexual harassment against

Meskunas, Massa would necessarily have investigated those complaints "thorough[ly]," which,

given that they were directed against Meskunas, necessarily meant that she would have addressed

---

[27] Similarly, in <u>Ghirardelli v. McAvey Sales & Serv.</u>, 287 F.Supp.2d 379, 388 (S.D.N.Y. 2003), the court
dismissed the defendant's claim of a lack of knowledge of the plaintiff's protected activity on the part of the ultimate
decisionmaker, the company's top officer, on the basis of the plaintiff's having "inform[ed] a senior official at the
company who reported to" the ultimate decisionmaker of his protected activity. The court in that case also rejected
the defendant's lack-of-knowledge argument on the ground that "the small size of [the defendant's] management
could lead a reasonable jury to infer that important information such as what [the plaintiff] told the [above-mentioned
senior official] would be shared with other top management officials like" the ultimate decisionmaker. *Id.* (citing
<u>Moree v. Frank H. Reis, Inc.</u>, 2001 WL 736810, at *8 (S.D.N.Y. June 25, 2001)("The Reis Group is a closely-held
company. As a result, a rational finder of fact could reasonably conclude that the alleged knowledge of the
company's management team members constitutes general corporate knowledge.")). That rationale would apply with
equal force here, where defendant's management is also very small, consisting of a mere ten people.

them with Meskunas, thereby necessarily apprising him thereof (*Id.*, ¶61(a)). <u>United States v. Thorpe</u>, 484 F.2d 1328, 1331 (2d Cir. 1973)("[W]e must presume that the [defendant] acted in accord with regular procedures"); <u>Davis v. City of New York</u>, 228 F.Supp.2d 327, 341 (S.D.N.Y. 2002)(Recognizing the "presumption that... subordinates... comply with the policies that are supposed to guide them"). Also, Massa admitted that, upon receiving complaints from plaintiff with respect to difficulties she was having with Sforza, Massa addressed them with Meskunas, giving rise to the reasonable inference that Massa would have taken the same action with respect to complaints by plaintiff of difficulties she was having Meskunas (Pl. 56.1 Stmt., ¶61(b)). Moreover, the denials of Meskunas that defendant relies upon in its defense on this issue not only necessarily give rise to a credibility assessment that is beyond the province of the Court upon summary judgment, <u>Rule</u>, *supra*, but necessitate such an assessment that very likely would not be made in Meskunas' favor. As discussed above, Meskunas clearly lied in his denials of having engaged in sexually harassing behavior toward plaintiff, as demonstrated quite dramatically by a rarity in discrimination cases, namely third-party witnesses coming forward to corroborate the plaintiff's account of her unlawful treatment. As these witnesses have no incentive to prevaricate on plaintiff's behalf – and in fact one of them, Davidson, in being a personal friend of Meskunas, would, if anything, have had a motive for lying on *his* behalf – they unquestionably refute Meskunas' denials, and thus show him to be devoid of credibility. And given the fundamental principle that a "jury could disregard the entire testimony of [a witness] because it was false in part," <u>United States v. Passero</u>, 290 F.2d 238, 246 (2d Cir. 1961), the jury herein, once presented with Meskunas' drumbeat of denials of having committed sexual harassment and the evidence exploding them, would almost certainly reject anything else he asserted, such as, in this instance, failing to know of plaintiff's protected activity. Finally, even if there were none of the highly

20

persuasive evidence of Meskunas' knowledge of plaintiff's protected activity discussed above, the fact that Meskunas made the termination decision in concert with an individual – Massa – who was directly aware of that activity, serves to raise the inference of an adverse decision influenced by that activity. Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, (2d Cir. 2004)("[I]mpermissible bias of a single individual at any stage of the... process may taint the ultimate employment decision... even absent evidence of illegitimate bias on the part of the ultimate decisionmaker"); Rosen, 928 F.2d at 534 ("[E]ven if [the ultimate decisionmaker] was unaware... he was not the sole individual responsible for [plaintiff's] dismissal").

As for its assertion that plaintiff cannot establish a causal connection between her protected activity and her discharge, defendant abandons all pretense of honoring fact and law. Defendant's "defense" on this score is that because one to two months elapsed between plaintiff's consultation of an attorney for the purpose of exploring the institution of legal action against defendant for sexual harassment and her termination, the causal element – which, of course, may be demonstrated by "showing that the protected activity was followed closely in time by the adverse action," Cifra, 252 F.3d at 217 – is lacking. After having spent so much time arguing a supposed lack of knowledge on its part of plaintiff's protected activity, one would assume that defendant would well understand that it is not when plaintiff consulted an attorney that is the trigger for measuring the temporal proximity between protected activity and adverse action, but when defendant *learned* of such consultation, and plaintiff's revelation to defendant of her intent to consult an attorney occurred but a week before her discharge, thereby fashioning a phenomenally tight temporal link between those two events, *Id.* (Causation where 20 days passed between plaintiff's notice to defendant of her retention of counsel and termination); Quinn, 159 F.3d at 769 (Causation where two months elapsed between plaintiff's notice to

defendant of intent to pursue legal action and discharge), especially given that, contrary to defendant's gross misrepresentation thereof,[28] the Second Circuit, while "ha[ving] not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish" causation, Gorman-Bakos v. Cornell Coop. Ext., 252 F.3d 545, 554 (2d Cir. 2001), has endorsed findings of sufficient temporal proximity on the basis of elapses of upwards of eight months, Id., at 554-55 (Surveying findings of sufficient temporal proximity, and holding in that case four months to be sufficient). Accordingly, plaintiff has fully established her prima facie case, thereby, per the well-established burden-shifting framework, transferring the burden to defendant to articulate a non-retaliatory basis for its termination of her. Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003).

**B.    Defendant's Asserted Reasons Are Pretexts for Retaliation**

Before addressing defendant's articulated reasons for plaintiff's discharge, it is important to note what are *not* among those reasons. First, though defendant makes reference in its papers to lateness on plaintiff's part, including citation to a September 3, 2006 disciplinary warning on the subject, Meskunas made clear that he neither fired employees generally on account of lateness nor then fired plaintiff in particular on that ground, a concession confirmed by his counsel and binding upon defendant. Purgess v. Sharrock, 33 F.3d 134, 144 (2d Cir. 1994) ("Statements made by an attorney concerning a matter within h[er] employment... admissible

---

[28] Fairly screaming its total lack of candor on this issue, defendant proffers the utterly incredible assertion that "[a] lapse of time between the alleged protected activity and any adverse employment action, even a one or two month lapse in time, indicates that there is no causal link" (Def. Mem. at 15), so that, apparently in defendant's world, if the adverse action fails to occur *simultaneously* with the protected activity, one may not establish causation on the basis of temporal proximity. Obviously, defendant's world in this regard is not the same as the real world, as, discussed above, causation on that basis may be found where "the protected activity was followed closely in time by the adverse action." *Id.* Only compounding this fantasy is defendant's citation in support of it to Clark County Sch. Dist. Breeden, 532 U.S. 268 (2001). In that case, the Supreme Court determined that the temporal gap between protected activity and adverse action failed to support a finding of causation not because there was a gap at all or because that gap was of a one-to-two-month duration, but rather because the gap was *twenty months*, *Id.*, at 273-74.

against the party retaining the attorney."). As such, lateness, even if demonstrable, is utterly

irrelevant as an alleged justification for plaintiff's termination. <u>Wallengren v. Samuel French,</u>

<u>Inc.</u>, 39 F.Supp.2d 343, 349 n. 1 (S.D.N.Y. 1999)(Where defendants "submitted work-related

documents written by plaintiff that contained obscenities, derogatory comments about

[defendant] and [his supervisor]," that "[the supervisor] does not claim that the behavior

reflected by those documents formed any part of the decision to fire plaintiff" compelled "the

court [to] find[] these documents to be immaterial"); <u>Miles v. North Gen. Hosp.</u>, 998 F.Supp.

377, 386 n. 4 (S.D.N.Y. 1998)(Where decisionmaker "admitted in her deposition that plaintiff

was fired for failing to submit reports and documentation," that "[t]here is some evidence in the

record of problems with patient care," even "warnings/reprimands," irrelevant).[29] In addition,

while in his affidavit Meskunas makes reference to plaintiff's sales performance and her

allegedly taking a sick day when she was not in fact sick, that these matters are not proffered in

defendant's Local Rule 56.1 Statement – at all, much less as alleged reasons for her discharge –

casts them beyond the ambit of cognizability upon this motion. <u>Greene v. New York</u>, 1998 U.S.

Dist. LEXIS 7650, *7 n. 4 (S.D.N.Y. May 22, 1998)(Where "an alleged incident... involving

Plaintiff's work performance... is described in [an] Affidavit," but "is not set forth in Defendants'

[56.1] Statement, [it] is not properly asserted as [a] fact to be admitted or disputed by Plaintiff"

---

[29] Even if such were not the case, defendant's claims of serial lateness by plaintiff would be severely undercut by the fact that there is no documentation to support this, as the above-mentioned September 3 warning is the sole documented record of what was supposedly extreme, habitual behavior. <u>Carlton v. Mystic Transp., Inc.</u>, 202 F.3d 129, 137 (2d Cir. 2000)(Claim of protracted poor performance pretextual where no contemporaneous record of such); <u>Batka v. Prime Charter Ltd.</u>, 301 F.Supp.2d 308, (S.D.N.Y. 2004)(Defendant's "decision not to memorialize [the] alleged deficiencies in Batka's work performance and the resulting lack of contemporaneous pre-litigation documentation on this question raise a genuine issue of material fact"). Furthermore, if defendant did not specifically disclaim lateness as a cause of plaintiff's discharge, a claim that she was terminated on that ground, when defendant admitted that lateness was a problem common among its employees, none of whom was fired as a result, would strongly indicate disparate treatment, and in turn pretext. <u>Miles</u>, 998 F.Supp. at 386 (Pretext where "defendant fired [plaintiff] for a problem shared by many other employees").

(citing Local Rule 56.1)). Even if defendant had properly raised plaintiff's sales performance, such would fail as a reason for her discharge. In the first place, Meskunas misrepresented the volume of plaintiff's sales, both in terms of sales made and sales hijacked from her by Sforza. Hurd v. JCB Int'l Credit Card Co., 923 F.Supp. 492, 503 (S.D.N.Y. 1996)("[Q]uestions about the validity of defendant's [sales performance] evaluation method" undermined poor performance claim). Second, plaintiff had garnered high customer service ratings and testimonial praise from customers, including for her product knowledge, which her secondary supervisor, DeSimone, also attested to her possessing, when her supposed lack of such knowledge was allegedly at the root of her claimed poor sales performance. Ramos v. Marriott Int'l, 134 F.Supp.2d 328, 340 (S.D.N.Y. 2001)(Claim that chef's cooking skills deficient undercut where her meals "received positive results from guests"); Peralta v. Cendant Corp., 123 F.Supp.2d 65, 80 (D.Conn. 2000) (Supervisor's favorable assessment of plaintiff in area claimed poor indicates pretext). And although selling motorcycles was the very essence of her job, so that her failing in that respect would have constituted the most significant performance deficiency imaginable for her, defendant, admittedly in the practice of documenting all matters of significance in regard to employee performance, never documented this most paramount of "failings" by plaintiff. Carlton, supra; Batka, supra. Moreover, even if plaintiff had performed deficiently in selling defendant's motorcycles, defendant could not legitimately assert such as a reason for her discharge when it denied her the training and resources necessary to excel at her job. Danzer v. Norden Sys., 151 F.3d 50, 54-5 (2d Cir. 1998)(Issue of fact as to poor performance where defendant denied plaintiff resources needed to perform his job); Renaldi v. Mfrs. & Traders Trust Co., 954 F.Supp. 614, 618-19 (W.D.N.Y 1997)(That plaintiff "was not given adequate training... to succeed in [his] position" undermined poor performance claim).

24

As to the actually asserted specifics of defendant's claim of poor performance, it is plaintiff's obligation to show them to be pretexts, Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1181 (2d Cir. 1996) – which showing, in combination with the prima facie case, "may permit the trier of fact to conclude that the employer unlawfully discriminated," Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 148 (2000) – and she carries this burden as well, as signaled instantly by the disconnect between defendant's declaration that "[p]laintiff's inability to perform her job responsibilities became apparent immediately upon her assumption of the Sales Associate position" (Def. Mem at 16) and the fact that it nonetheless continued to employ her in that position for nearly half a year. Chambers v. TRM Copy Ctrs., 43 F.3d 29, 39 (2d Cir. 1994) (Though defendant claimed "it quickly became evident... that [plaintiff] was in fact not capable of performing the duties of Shop Technician..., in fact [defendant] did not discharge him until he had been on the job for nearly nine months"). The claim that she "refused" to complete certain training courses is, of course, false, as it was not the fault of plaintiff that she was unable to complete those courses, but of defendant, for failing to provide her with the materials necessary for their completion, as part of its larger neglect to afford her the training required for her job. Danzer, supra; Renaldi, supra; Allen v. City of Yonkers, 803 F.Supp. 679, 707 (S.D.N.Y. 1992) (Pretext where plaintiff "not to blame for" alleged instance of poor performance). Regarding the September 21, 2006 "incident" in which plaintiff delivered the motorcycle against Sforza's wishes, as well as the December 20 instance involving plaintiff's noting her deals on the deal board over Sforza's objections, in both situations plaintiff undertook the supposedly improper actions pursuant to direct instructions that she do so from Meskunas, the company's President, and thereby not only acted completely properly, but did so with Meskunas, the one now leveling the charges of poor performance against her, knowing full well that she had. Dominic, 822 F.2d

25

at 1255 (Criticism of plaintiff by decisionmaker for taking action decisionmaker had ordered him

to take pretextual); Lederer v. BP Prods., 2006 U.S. Dist. LEXIS 87368, *21 (S.D.N.Y. Dec. 1,

2006)(Proof of discrimination where plaintiff disciplined for taking absences supervisor had

authorized); Vargas v. Chubb Group, 2002 U.S. Dist. LEXIS 18438, *20-1 (S.D.N.Y. Sept. 30,

2002)(Issue of fact as to act of alleged poor performance where plaintiff asserted act taken with

decisionmaker's approval). This Court in particular has looked well askance at "evidence" of this

sort, finding in Guglielmo v. Kopald, 2007 U.S. Dist. LEXIS 46558, *9-10 (S.D.N.Y. June 26,

2007)(Brieant, J.), that "the mere making of [disciplinary] charges" against the plaintiff

stemming from action that was in fact directed by her superiors "suggests an evil and improper

motive." As for the January 27 and February 4, 2007 "incidents" in which plaintiff allegedly

withheld information with respect to a trade-in and sold a motorcycle without disclosing a defect,

respectively, plaintiff proffers diametrically opposed accounts of these occurrences in which she

simply did not commit the acts of which she was accused, thereby presenting "conflicting

versions of events [that] are matters for the jury." Rule, supra; Rui Zhang v. Barr Labs., Inc.,

2000 U.S. Dist. LEXIS 6237, *22 (S.D.N.Y. May 8, 2000)(Plaintiff's denial of falsifying

research data, as defendant charged, creates credibility issue for jury). And obviously, if

plaintiff's accounts of these instances are accepted, so necessarily would be the fact that

Meskunas *knew* her accounts were true *at the time*, given that he was the one to whom plaintiff

related the circumstances establishing that she withheld no information with respect to the trade-

in, and that as President he would be expected to know who sold which motorcycles at his

dealership, so that he would have known full well that, in the case of the undisclosed defect, she

did not sell the bike in question. And as to the deposit issue, not only does plaintiff again offer a

version of events demonstrating herself to have followed the procedure for recording deposits,

but that version is partially corroborated by none other than defendant itself, via its multiple

admissions that the deposit was memorialized in the deal folder, just as procedure dictated it be.

Finally, concerning the unreturned chair, again, this is utterly petty fluff – not only inherently, but

as confirmed by the lack of any documentation of it, Carlton, *supra* – that defendant, in

scrambling for a defense, has cynically trumped up into an allegedly major offense. Back, 365

F.3d at 124 ("[A] jury could find that the... deficiencies cited by the defendants were minor and

unimportant... before the development of the purported discriminatory motive"), a machination

that this Court has also found to be just that, Guglielmo, *supra* (Discounting "disciplinary

charges" as "petty"). Given the foregoing, plaintiff's "disciplinary record" is but a paper trail

"fabricated to make it appear that there was a history of poor performance at work." Bergin v.

Infra-Structures Co., 1996 U.S. Dist. LEXIS 22604, *11 (E.D.N.Y. Dec. 6, 1996). And

defendant's effort to deflect this conclusion by claiming that the matters reflected by the file it

built against her arose "long before [she] claims to have complained about sexual harassment"

(Def. Mem. at 20) is yet another untruth, as plaintiff has made clear that she complained of

sexual harassment to Massa throughout her year-plus employment with defendant.[30]

Also indicating the falsity of defendant's claim of poor performance are the facts (a) that,

in being fired, plaintiff was not told that she was being dismissed for poor performance, Batka,

301 F.Supp.2d at 315; (b) that Massa offered to write the allegedly poor-performing plaintiff a

recommendation, EEOC v. A. Sam & Sons, 872 F.Supp. 29, 33 n.10 (W.D.N.Y. 1994); and (c)

that Massa proffered an alleged reason for plaintiff's dismissal – her supposed revelation to a

customer of an internal pricing document (Pl. 56.1 Stmt., ¶62) – that is inconsistent with those

---

[30] *See* Ramos, 134 F.Supp.2d at 347 (Causal connection between protected activity and discharge established where plaintiff consistently complained of discrimination "over the course of a year").

comprising defendant's stated defense, <u>Belfi v. Prendergast</u>, 191 F.3d 129, 139 (2d Cir. 1999). Finally, defendant's claims of plaintiff's poor performance are pressed on its behalf by Meskunas, who, as discussed above, is a witness shorn of all credibility. With defendant having failed to move against plaintiff's sexual harassment claims, a trial in this case is assured, thereby underscoring the propriety of leaving to the jury the myriad factual issues and credibility disputes surrounding her accompanying claims of retaliation.

## C.    **Defendant's Retaliatory Interference With Plaintiff's COBRA Rights**

After her termination, plaintiff elected to continue her health coverage under COBRA and paid for such coverage for March and April 2007 (Pl. 56.1 Stmt., ¶43). However, upon learning that she had been denied reimbursement for medical bills incurred during those months, plaintiff contacted defendant's insurer and was advised by the insurer that defendant had failed to make the required payments for her (*Id.*, ¶46). Defendant claims it did make those payments and that the termination of plaintiff's coverage was due to an error by the insurer, which error has been corrected, assertions allegedly supported by documentation it finally, after it filed its motion, produced to plaintiff (*Id.*, ¶55). However, all that documentation shows is that plaintiff's coverage was retroactively reinstated; what it fails to show then is whether such reinstatement came as a means of rectifying the insurer's supposed error or because defendant, once faced with a claim of retaliation for not making the payments, belatedly made them (*Id.*). Plaintiff also requested of defendant all checks evidencing payment for plaintiff, which presumably would show what payments were made and when – yet, defendant has failed repeatedly to produce them (*Id.*). As such, issues of fact permeate this matter, and are thus for a jury to resolve. <u>Rule</u>, *supra.*

## CONCLUSION

Plaintiff respectfully requests that the Court deny defendant's motion in its entirety.

Dated: White Plains, New York
      January 10, 2008

Respectfully submitted,

BERNBACH LAW FIRM PLLC

By:   <u>s/ Jason Bernbach</u>
      Jason Bernbach (JLB-3392)
      Jeffrey M. Bernbach (JMB-5131)
      245 Main Street
      White Plains, New York 10601
      Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Partial Summary Judgment was served by Federal Express on Putney, Twombly, Hall & Hirson LLP, attorneys for defendants, 521 Fifth Avenue, New York, New York 10175, on the 10th day of January, 2008.

s/ Jason Bernbach
Jason Bernbach (JLB-3392)