UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

MICHELLE LOSCALZO,

                              Plaintiff,                    07 Civ. 3046 (CLB)

          -against-

                                                           FILED VIA ECF

NEW ROC MOTORCYCLES, LLC,


                              Defendant.
------------------------------------------------------------------ x

## PLAINTIFF'S STATEMENT PURSUANT TO LOCAL RULE 56.1

In accordance with Rule 56.1 of the Local Rules of the United States District Court for

the Southern District of New York, plaintiff Michelle Loscalzo ("Plaintiff") respectfully submits

the following statement of material facts in opposition to the motion for partial summary

judgment of defendant New Roc Motorcycles, LLC ("Defendant").

Plaintiff addresses the representations in defendant's Local Rule 56.1 Statement as

follows:

1-4.  Admitted.

5.  Disputed as being an incomplete description of plaintiff's responsibilities as greeter,

which responsibilities also included attempting to obtain the customers' names, phone numbers

and e-mail addresses for addition to defendant's mailing list, directing them to wherever in the

store they desired to go, showing them the motorcycles for sale when the store's salespersons

were otherwise occupied, and keeping the premises neat and clean (Loscalzo Tr. 121, 128-29;

Meskunas Tr. 32).[1]

    6. Admitted.

    7. Admitted.

    8 & 9. Disputed. Defendant's President and part-owner John Meskunas ("Meskunas") described the salesperson's responsibilities as: "work[ing] on motorcycle displays; keep[ing] the motorcycles clean; mov[ing] the motorcycles around on the floor; help[ing] customers demonstrate the motorcycles; tak[ing] information for test rides; accompany[ing] customers on test rides; find[ing] the right motorcycle for the customer; fit[ting] it to them; select[ing] parts and accessories; tak[ing] deposits; fill[ing] out paperwork; record[ing] deposits; tak[ing] payments of whatever type the customer's making, get[ting] their copies of their driver's license; get[ting] copies of their insurance cards; get[ting] whatever other department and [sic] motor vehicle information that's required; help[ing] the customer with financing; tell[ing] them about other offers that the dealership has, such as extended service plans, credit life insurance, other products that might be sold along with the motorcycle; selecting parts and accessories for the motorcycle; helping the customer get their proper clothing and protective gear; taking the customer to the service department and introducing them to the service manager; taking the customer to the parts department and introducing them to the parts manager; taking them to the motor clothes department and introducing them to someone there; following up on the paperwork, following up with the service department to make sure that the vehicle is prepared to the customer's specifications prior to delivery; arranging the delivery with the customer; bringing

---

[1] "Tr." refers to the transcript of the deposition testimony of the particular witness whose name precedes it, relevant excerpts of which transcripts are annexed as Exhibits 1-7 of the accompanying Declaration of Jason Bernbach (the "Bernbach Dec.").

the customer in for delivery and reviewing all the aspects of the motorcycle, both technical and physical, and going over the owner's manual with the customer; going over the warranty; going over the service and maintenance points on the motorcycle; reviewing the operation and the controls of the motorcycle and then ultimately seeing the customer off; following up with the customer after the sale to make sure they got home safely; calling them a few days later to make sure that the customer's happy; asking the customer for referrals;... maintaining an ongoing dialogue with the customer to bring them back for events." (Meskunas Tr. 7-8, 52-3).

    10-12.  Admitted.

    13.  Disputed.

        (a) That plaintiff was promoted by defendant to the position of salesperson, in which she would "sell Harley Davidson Motorcycles," evidences defendant's belief that she possessed "the skills and knowledge necessary to sell Harley Davidson Motorcycles" (Meskunas Tr. 41, 45-7, 50; Loscalzo Tr. 127, 166, 223-24; Sforza Tr. 19-20);

        (b) Plaintiff's promotion to salesperson came after Meskunas had rejected a number of other candidates for the position for lacking the necessary attributes "to sell Harley Davidson Motorcycles," thereby demonstrating his belief that plaintiff, unlike those others, did in fact possess "the skills and knowledge necessary to sell Harley Davidson Motorcycles" (Meskunas Tr. 48);

        (c) Meskunas promoted plaintiff to salesperson over the objection of his Sales Manager Wayne Sforza ("Sforza"), thereby evidencing Meskunas' confidence that plaintiff possessed "the skills and knowledge necessary to sell Harley Davidson Motorcycles" (Sforza Tr. 18-19);

(d) Due to one of his salespersons' being out at the time on an extended medical leave, Meskunas was promoting plaintiff into a position in which she would represent fully one-half of defendant's sales force, thereby evidencing his confidence that plaintiff possessed "the skills and knowledge necessary to sell Harley Davidson Motorcycles" (Meskunas Tr. 46-7; Loscalzo Tr. 223-24; Sforza Tr. 19-20);

(e) Plaintiff had experience as a motorcycle salesperson, working in that position for BMW for two years (Loscalzo Tr. 221; Bernbach Dec., Ex. 8);

(f) One of plaintiff's responsibilities while greeter was to assist customers with defendant's motorcycles when the store's sales staff was unavailable (Loscalzo Tr. 121, 128-29);

(g) Plaintiff was successful in selling Harley Davidson motorcycles, closing a good number of deals in her short time as a salesperson, receiving high customer service ratings and other expressions of customer satisfaction, and having her sales performance, including her product knowledge, praised by customers in their discussions with her former supervisor during her term as greeter, Adrianna Davidson ("Davidson") (*see* ¶¶79, 136-38, 152, *infra*);

(h) Plaintiff sold more motorcycles than she was given credit for, as a result of Sforza's penchant for commandeering her deals in order to keep the commissions involved for himself (*see* ¶¶139-40, *infra*);

(i) Defendant's second-in-charge of its sales department, Finance and Insurance Manager Tony DeSimone ("DeSimone"), affirmed that, with respect to defendant's Harley Davidson motorcycles, plaintiff "kn[e]w the product." (DeSimone Tr. 7, 34, 71; Massa Tr. 97);

(j) Plaintiff was denied by defendant training and resources necessary to the performance of her position of salesperson (*see* ¶¶141-48, *infra*);

4

(k) Asked for specific examples of plaintiff's alleged lack of the knowledge necessary to sell Harley Davidson motorcycles, Meskunas proffered but one, in which, it turned out, the one evidencing a lack of such knowledge was not plaintiff, but Meskunas himself (*see* ¶¶150, 151, *infra*);

(l) It is defendant's practice to document all significant performance failings, yet there exists not a shred of documentation reflecting any criticism or discipline of plaintiff for her alleged lack of "the skills and knowledge necessary to sell Harley Davidson Motorcycles," clearly the most significant failing possible for one whose job's "ultimate purpose" is "to sell Harley Davidson motorcycles" (Meskunas Tr. 50, 159; Sforza Tr. 38; Massa Aff., ¶¶15-21, Exs. E-J (recounting the entirety of plaintiff's documented "performance deficiencies")).[2]

14. Disputed.

(a) The instances cited by defendant in which plaintiff allegedly "refused to follow Mr. Sforza's instructions" have been shown to have been instances in which plaintiff was in fact following the instructions of Sforza's superior, defendant's President and owner Meskunas, pursuant to Meskunas' overarching directive to her that, when in receipt of contrary instructions from him and Sforza, she was to follow his instructions and not Sforza's (*see* ¶¶154-61, *infra*);

(b) It was Sforza who "went out of h[is] way to antagonize" plaintiff, and not the other way around, with Sforza:

(i) often speaking intemperately to or outright yelling at her, to the point that on a number of occasions he drove her to tears (DeSimone Tr. 31, 69-70,72, 80);

---

[2] "Massa Aff." refers to the Affidavit of Patricia Massa, submitted by defendant in connection with its motion.

(ii)  refusing to train or otherwise assist her in the performance of her duties as salesperson, despite his being her supervisor and required to provide her such help; disregarding her communications to him; and denying her access to basic sales-related information, such as defendant's inventory list (*Id*., 70; Loscalzo Tr. 224, 277);

(iii)  upbraiding her and/or attempting to penalize her for petty matters (*e.g.* ordering plaintiff to leave the store when she arrived a few minutes late and wearing sneakers, with her shoes in her hand to change into, an order deemed inappropriate and reversed by Denise Meskunas, Meskunas' wife and defendant's Vice President and majority owner, and also discounted by Meskunas, who termed plaintiff's conduct in regard to her footwear "perfectly acceptable"; and condemning plaintiff for failing to return a chair to his office a chair she had borrowed) (Loscalzo Tr. 259, 300-2; Massa Tr. 26-7; Meskunas Tr. 80-1; DeSimone Tr. 30-1, 69; Massa Aff., ¶19);

(iv)  baselessly accusing plaintiff of attempting to steal his deals, while in fact stealing hers (Loscalzo Tr. 226-27, 230-31, 289-292, 296, 298-99; DeSimone Tr. 32-3);

(v)  rejecting every request of plaintiff for time off or to attend off-site work-related events, including her requests for days off to attend her cousin's and best friend's respective weddings (Loscalzo Tr. 201-2, 225, 231);

(c)  Defendant knew full well of Sforza's antagonism of plaintiff, as plaintiff complained to defendant about it and, as a result of those complaints having been taken "very seriously" by defendant, Sforza was counseled, and in fact "seriously disciplined," by defendant for it (Massa Tr. 17, 21-3; Bernbach Dec., Ex. 13).

15.  Disputed.

6

(a)  The time sheets relied upon by defendant to "establish" plaintiff's instances of alleged lateness (Massa Aff., ¶13, Ex. C) merely recorded when plaintiff punched in on the store's time clock, not necessarily when she actually arrived at the premises, a significant distinction given that plaintiff explained that she frequently did not punch in immediately upon entering the store, due to the need to tend right away to customers (Loscalzo Tr. 260-61);

(b)  As a result, plaintiff was nowhere near as late as defendant alleges, a fact confirmed by DeSimone, who testified, as plaintiff did, that plaintiff was ordinarily on time (*Id.* & DeSimone Tr. 6-7, 30);

(c) Meskunas never reprimanded plaintiff for such alleged rampant lateness; there exists but one documented instance of lateness on plaintiff's part, despite defendant's practice to document all performance problems of significance; and both defendant and its counsel have specifically disclaimed lateness as a ground for plaintiff's discharge (*see* ¶¶88-91, 95, 97, *infra*).

16.  Disputed. Despite, as discussed below, not being provided with the resources required to complete the large majority of the online training courses, plaintiff did manage to complete four of them, as conceded by defendant (Massa Aff., ¶14; Def. 56.1 Stmt., ¶18).

17.  Admitted.

18.  Admitted, but noted that plaintiff's inability to complete the balance of the online training courses derived from defendant's refusal to grant her repeated requests for various materials not available online, *e.g.* workbooks, reference sources and CDs, that were required in order to successfully complete the courses, refusals that were part and parcel of its larger denial to her of the training required for her position (Loscalzo Tr. 247-48, 277; DeSimone Tr. 70; Sforza Tr. 36, 53).

19 & 20.  Admitted that plaintiff received a series of warnings, but disputed that such played any role in her discharge, as all of those warnings were baseless, and known by defendant to have been baseless (*See* ¶¶154-180, 182-184, *infra*).

21.  Admitted that plaintiff received, on September 3, 2006, a written warning from Sforza concerning lateness and her alleged failure to report to work in "appropriate business attire," but disputed that such played any role in her discharge, as defendant – along with its counsel – has specifically disclaimed lateness as a ground for plaintiff's termination, and Meskunas has refuted the "appropriate business attire" branch of the write-up, via his concession that the conduct of plaintiff at issue in that regard, *i.e.* her wearing sneakers into the store while carrying in her hand the shoes she intended to change into, was "perfectly acceptable." (Meskunas Tr. 44, 80; 121-22; Sforza Tr. 35; Loscalzo Tr. 259; Bernbach Dec., Ex. 21).

22.  Admitted that plaintiff received, on September 21, 2006, a written warning allegedly for insubordination, but disputed that such played any role in her discharge, as the charge underlying the warning, that plaintiff had delivered a motorcycle while Sforza was not present, was baseless, and known by defendant to be baseless, as, in delivering the motorcycle in question, plaintiff was following the express instructions of Meskunas – as well as Meskunas' overarching directive to her that, when she received conflicting orders from him and Sforza, she was always to follow his command, and not Sforza's – and thus was in no way, and was known by defendant to have been in no way, acting insubordinately (*See* ¶¶154-157, *infra*).

23.  Admitted that plaintiff received, on December 20, 2006, a written warning allegedly for failing to follow procedure, but disputed that such played any role in her discharge, as the incident underlying the warning again was an instance in which she was written up for failing to

follow Sforza's instructions, when in fact, and as known full well to defendant, she had been

following contrary instructions from Meskunas; specifically, Sforza's warning derived from

plaintiff's writing her deals on the deal board in DeSimone's office, which Sforza told her not to

do, but which Meskunas *had* told her to do (*See* ¶¶158-161, *infra*).

24.  Admitted that plaintiff received, on January 5, 2007, a written warning for allegedly

not following procedure with respect to taking and recording a deposit, but disputed that such

played any role in her discharge, as plaintiff indisputably followed defendant's procedure for

taking and recording deposits, as known and in fact conceded by defendant; specifically,

Meskunas explained that, per defendant's procedures, deposits were to be recorded in either the

"deal folder" or on the company's computer system, and on this particular occasion plaintiff

recorded the deposit in question in the deal folder, as noted by defendant both in the warning

itself and in its brief upon this motion, and given that the deposit was taken by credit card, and all

credit-card transactions at defendant are automatically entered on defendant's computer system

as part of the store's daily "batch report" – a computerized log of all credit-card transactions

occurring in the store each day – plaintiff also properly memorialized the deposit on the

company's computer system, so that she in fact recorded the deposit by both of the approved

means for doing so (*See* ¶¶162-169, *infra*).

25.  Disputed that, on January 22, 2007, plaintiff was "counseled" by Sforza "regarding

her failure to follow proper procedure," as this "matter" was merely one in which Sforza was

pettily perturbed at plaintiff's having failed to return a chair she had borrowed from his office so

as to permit her to conduct business with customers at her desk – which she was permitted to do,

and had no choice but to do, given that, as with defendant's larger refusal to provide her with the

resources necessary to perform her job optimally, her repeated requests for chairs for her desk (precipitated by the fact that she, unlike everyone else in the store, had none) had been disregarded (Loscalzo Tr. 301; Sforza Tr. 77). And with it being defendant's practice to document all significant performance failings, that there exists no documentation of this matter shows it to have been anything but significant (Meskunas Tr. 159; Sforza Tr. 38; Mass Aff., ¶¶15-12, Exs. E-J).

26.  Admitted that there exists a written memorandum to plaintiff's personnel file, dated January 27, 2007, purporting to relate an instance in which, according to Meskunas, plaintiff deliberately failed to disclose certain information about a motorcycle trade-in, but disputed that such played any role in her discharge, as plaintiff engaged in no such deliberate withholding of relevant information, and made such clear to Meskunas in her discussions with him on the subject (*See* ¶¶170-176, *infra*).

27.  Admitted that there exists a written memorandum to plaintiff's personnel file, dated February 4, 2007, purporting to relate an instance in which plaintiff allegedly sold a motorcycle without disclosing to the customer that the front fender had been repainted, but disputed that such played any role in her discharge, as plaintiff not only did not sell the motorcycle in question – Sforza did – but she was not even present in the store that day, having been out sick (Loscalzo Dec., ¶11; Bernbach Dec., Ex. 20).[3]

28.  Admitted that defendant decided to terminate plaintiff's employment with it – only a week after plaintiff advised it, in the person of Massa, that she intended to pursue legal action against it – but disputed that Meskunas made the decision alone, as it was in fact made in concert

---

[3] "Loscalzo Dec." refers to the Declaration of Michelle Loscalzo, submitted herewith.

with Massa and Sforza, and that the decision related in any way to plaintiff's performance, given

(a) that the instances cited by defendant as its "proof" of plaintiff's alleged poor performance are,

as shown above, demonstrably contrived; (b) that, when terminating plaintiff, Meskunas failed to

identify poor performance, much less any of the specific instances supposedly underlying it, as

the reason for the termination, saying only that "it just didn't work out"; and (c) that, during the

termination meeting, Massa volunteered that she would be "happy" to give the allegedly

abysmally-performing plaintiff "a good recommendation for another job" if she needed it

(Loscalzo Tr. 239-41, 251, 256, 263-64; Meskunas Tr. 121; Massa Tr. 66; Loscalzo Dec., ¶7;

¶¶21-27, *supra*).

29 & 30.  Admitted.

31.  Admitted that, during the termination meeting, plaintiff stated that half of it was her

fault, but disputed that this comment was in any way an admission of poor performance on her

part (as defendant conclusorily asserts in its brief), but rather was, as plaintiff explained without

dispute, a reference to her regret that she had not stood up for herself more forcefully in the face

of Meskunas' sexual harassment and Sforza's various shenanigans (Loscalzo Tr. 246, 250-51;

Bernbach Dec., Ex. 13).

32-34.  Admitted.

35.  Disputed.

(a)  On numerous occasions throughout her employment with defendant, both as

greeter and salesperson, plaintiff registered complaints about Meskunas' sexually harassing

behavior (detailed at ¶¶110-125, *infra*) with Massa, who, by virtue of her position of Human

Resources Manager, as well as under defendant's sexual harassment policy, was designated to

receive and investigate complaints of that nature (Loscalzo Tr. 156-57, 160-61, 238, 245, 274-75, 283, 303; Meskunas Tr. 119-20; Massa Tr. 9-10; Loscalzo Dec., ¶¶5-7; Bernbach Dec., Ex. 12; ¶¶127, 128, *infra*);

      (b)  Approximately one week before she would be terminated, plaintiff advised Massa that she was going to seek legal counsel to explore her rights and the matter of enforcing them on account of the sexual harassment she had suffered at defendant (Loscalzo Dec., ¶7; Loscalzo Tr. 239-41, 263-64);

      (c)  DeSimone testified that contemporaneous with certain of her complaints of sexual harassment to Massa, plaintiff advised him that she had registered such complaints (*see* ¶132, *infra*);

      (d)  Massa denies having received from plaintiff complaints of sexual harassment, as well as notice of plaintiff's intention to explore legal action against defendant, because she is afraid that legal action by plaintiff against defendant would jeopardize her employment, as she revealed to plaintiff in a February 24, 2007 e-mail, wherein she admonished plaintiff that, in "going after a small business owner," she "ha[s] put my job and everyone else's here in jeopardy." (Bernbach Dec., Ex. 13).

      (e)  Defendant concedes that "[p]laintiff alleges in her Amended Complaint and her deposition testimony that she complained to Ms. Massa about sexual harassment in the workplace and advised Ms. Massa that she had consulted an attorney regarding her complaints," thereby rendering its claim at ¶35 of its Local Rule 56.1 Statement that plaintiff failed to "complain to anybody about sexual harassment" by definition disputed, and thus inappropriate for inclusion in a statement of allegedly undisputed facts (Def. Mem. at 14).

36.  Disputed. While plaintiff sought assistance from Meskunas with respect to Sforza's efforts to deny her commissions she had rightfully earned – because, as confirmed by DeSimone, Meskunas, as owner, was "the only person that would be able to help her" in that regard – and in connection with certain denials by Sforza of time-off requests of hers (Loscalzo Tr. 50, 52, 201-2, 225, 231; DeSimone Tr. 33), the bulk of plaintiff's complaints regarding Sforza were lodged with Massa (Massa Tr. 21-5; Bernbach Dec., Ex. 13). Moreover, frequently when going to Meskunas for assistance with such Sforza-related issues, plaintiff was met not with the aid she sought from Meskunas, but rather with sexually harassing behavior from him, specifically his lewd entreaties to her: "Come here, baby, come sit on my lap and tell me all about it." (Loscalzo Tr. 101, 246).

37.  Disputed.

(a) Meskunas only occasionally rectified Sforza's commission-related machinations (*Id.*, 50);

(b) Plaintiff's approaches to Meskunas were often met with the most unhelpful, sexually harassing responses of "Come here, baby, come sit on my lap and tell me all about it." (*Id.*, 101, 246).

38.  Disputed.

(a)  Plaintiff had repeatedly complained to Massa about Meskunas' sexually harassing behavior toward her, and had, the week before her termination, advised Massa of her intention to seek legal counsel in connection with pursuing claims of sexual harassment against defendant (*see* ¶35, *supra*);

(b) On February 23, 2007, plaintiff called Massa, because, considering Massa a

13

friend, and in light of their conversation the week before plaintiff was terminated in which

plaintiff advised Massa that she would be consulting a lawyer to explore legal action against

defendant for sexual harassment, she wanted to let Massa know that she was in fact going to sue

defendant, before Massa found out from Meskunas, via the letter to that effect from plaintiff's

counsel that had been sent to Meskunas on February 20 (Loscalzo Tr. 240-42, 244; Bernbach

Dec., Exs 13, 22).

39.   Admitted that Massa *wrote* in a February 24, 2007 e-mail to plaintiff that she was

"shock[ed]" by plaintiff's allegations of sexual harassment, but disputed that Massa *was* in fact

"shock[ed]" by plaintiff's allegations, as she had heard them before from plaintiff, and as her

reasons for feigning "shock" were clearly revealed in that same e-mail (*See* ¶35, *supra*).

40.   Disputed. As discussed at ¶38(b), *supra*, plaintiff called Massa on February 23, 2007,

because, considering Massa a friend, she wanted to alert Massa to the fact that she had decided to

sue defendant for sexual harassment, before Massa heard it from Meskunas, to whom plaintiff's

counsel had sent a letter on February 20 expressing her intention to sue. However, that letter had

been first opened by Massa, who thus knew of plaintiff's intention by the time plaintiff called

her. Accordingly, in an e-mail later on February 23, plaintiff apologized to Massa "for not telling

you sooner," a self-evident reference to what Massa had learned by way of the letter that plaintiff

had hoped to preempt with her call, *i.e.* that plaintiff had actually decided to pursue legal action

against defendant, and not in any way indicating that this was the first time ever that plaintiff had

apprised Massa of Meskunas' sexual harassment of her (Loscalzo Tr. 240-42, 244-45; Massa Tr.

49-50; Bernbach Dec., Ex. 13).

41.   Disputed.  Defendant's ¶41 is based upon ¶28 of Massa's affidavit, which itself

14

purports to be based upon a February 27, 2007 e-mail from plaintiff "request[ing] that the

COBRA forms be emailed to her" that it states is annexed to the affidavit as Exhibit L. However,

no such e-mail from plaintiff is annexed to Massa's affidavit, as Exhibit L or otherwise.

42-44.  Admitted.

45.  Disputed.  Massa did not "submit [plaintiff's check for her March and April COBRA

payments] to the Bank of American [sic] for deposit"; rather, she testified she turned the check

over to defendant's accounting department and merely assumed that it was thereafter deposited in

an account maintained by defendant (Massa Tr. 71-2).

46.  Disputed.  After attempting to submit medical bills to defendant's insurer Aetna for

reimbursement and learning from Aetna that those claims had been denied, plaintiff contacted

Aetna and was informed by an Aetna representative that no payments had ever been made on her

behalf for the continuation of her coverage, and as such her coverage had been terminated as of

February 28, 2007, the date upon which her coverage was to conclude in the absence of an

election of her COBRA option and payment therefor (*Id.*, 70, 73-4; Loscalzo Tr. 91, 264-65;

Bernbach Dec., Exs. 23, 24).

47.  Admitted.

48.  Admitted that, had defendant made the payments to Aetna that it was required to

make in order to continue plaintiff's health coverage under COBRA, so as to continue the

coverage beyond April 30, 2007, plaintiff would have been required to submit a COBRA check

by May 1, 2007, or within the ensuing thirty-day grace period; however, as shown at ¶46 above,

any such action on her part would have been ineffective, given that her coverage had already

been canceled two months earlier.

15

49-51.  Admitted, but with the caveat discussed at ¶48, *supra*, *i.e.* that at the points in time noted in defendant's corresponding ¶¶49-51, plaintiff's coverage had already terminated, so that at those junctures there was in fact no coverage in place to continue.

52.  Disputed.  As shown at ¶46, *supra*, plaintiff's coverage did not terminate as of May 1, 2007 as a result of her nonpayment, but had terminated over two months earlier as a result – as she had been advised by Aetna – of defendant's nonpayment of premiums to Aetna on her behalf.

53 & 54.  Admitted.

55.  Disputed.  Massa's testimony on this issue is inherently contradictory. On the one hand, she claimed that she learned plaintiff's health coverage had terminated as of February 28, 2007 upon being spurred by this lawsuit to review Aetna's monthly bills to defendant for the relevant time period, and in so doing becoming aware that plaintiff had been removed from the bills as of March 1, 2007 (Massa Tr. 73-5). Yet, on the other hand, Massa contended that plaintiff had been included – and hence paid for – in defendant's March and April 2007 Aetna bills (*Id.*, 84-5). In her testimony, Massa repeatedly asserted that the series of bills in question would demonstrate that the insurer had made an error in deeming plaintiff's coverage canceled as of February 28, 2007, and while defendant has belatedly (more than two weeks after filing its motion herein) produced certain documents in response to plaintiff's repeated requests for those bills, as well as for copies of the checks showing that defendant had forwarded to Aetna payment for plaintiff's coverage for March and April 2007, those documents – none of which are the requested checks – merely show that plaintiff's health coverage for March and April was retroactively reinstated by Aetna, and as such provide no indication as to when the underlying payments for the coverage were made, whether at the time they were originally due or later, after

the claim herein for such coverage's denial was made.  (*Id*., 76, 80-4; Bernbach Dec., Exs. 23-4).

56.  Disputed. As discussed at ¶55, *supra*, the documents produced by defendant  as supposed proof of Aetna's error merely evidence that Aetna reinstated plaintiff's coverage for March and April 2007, and thus do not indicate whether such action was taken because Aetna was acknowledging past payments for those months that it had failed erroneously at the time to credit, or because defendant had belatedly, and only after having had a claim asserted against it for its nonpayment for those months, made the payments in question (Massa Tr. 76, 80-4; Bernbach Dec., Exs. 23-4).

57.  Disputed. *See* ¶56, *supra*.

58 & 59.  Admitted.

60.  Disputed. *See* ¶¶35, 38-40, *supra*.

61.  Disputed.

(a) Defendant's sexual harassment policy (as well as the responsibilities inherent in her position as Human Resources Manager, which position invests her with dominion over all personnel matters) designates Massa, among others, as a proper recipient of complaints of sexual harassment, and provides that, upon receipt of such a complaint, "a thorough, objective investigation" into the complaint "will be undertaken, without prejudice or retaliation against the person making the report," so that, upon receiving plaintiff's numerous complaints of sexual harassment against Meskunas, Massa would necessarily have investigated those complaints "thorough[ly]," which, given that they were directed against Meskunas, necessarily meant that she would have addressed them with Meskunas, thereby necessarily apprising him thereof (Loscalzo Tr. 156-57, 160-61, 238, 245, 274-75, 283, 303; Meskunas Tr. 119-20; Massa Tr. 9-

10; Loscalzo Dec., ¶¶5-7; Bernbach Dec., Ex. 12);

(b)  Upon receiving complaints from plaintiff with respect to difficulties she was having with Sforza, Massa addressed them with Meskunas, giving rise to the reasonable inference that Massa would have taken the same action with respect to complaints by plaintiff of difficulties she was having Meskunas (Massa Tr. 24-5; Bernbach Dec., Ex. 13);

(c)  Upon learning of plaintiff's intention to sue defendant for sexual harassment based upon Meskunas' conduct toward her, by way of reading the letter from plaintiff's counsel making clear such intention, Massa promptly brought such information to Meskunas' attention, and thereafter had numerous conversations with Meskunas on the subject, thereby giving rise to the reasonable inference that, after having been advised by plaintiff in late January 2007 that she planned to consult an attorney to explore the matter of suing defendant for sexual harassment based upon Meskunas' conduct toward her, Massa promptly brought such information to Meskunas' attention and discussed it with him (Massa Tr. 49-50; Loscalzo Tr. 239-41, 262-63; Loscalzo Dec., ¶7);

(d)  Defendant's management, of which Meskunas and Massa are members, is comprised of a small group of people, thereby giving rise to the reasonable inference that information of significance imparted to one member of that group is disseminated to others thereof (Meskunas Tr. 12-13; Davidson Tr. 41-2; Massa Tr. 34-5);

(e)  Massa was involved in the decision to terminate plaintiff, which gives rise to the reasonable inference that her knowledge of plaintiff's complaints infected the process leading to that decision (Massa Tr. 66; Meskunas Tr. 121).

62.  Disputed.  *See* ¶¶19-28, *supra*. Also, in the course of enumerating the alleged reasons

18

for plaintiff's discharge, Massa proffered a supposed ground therefor not otherwise advanced by defendant, in deposition testimony, in affidavits (including her own) or in its brief or Local Rule 56.1 Statement, *i.e.* that, shortly before her termination, plaintiff had improperly disclosed an internal invoice to a customer regarding defendant's pricing schemes (Massa Tr. 63-4). Massa went on to claim that this alleged infraction was written up and the resulting documentation placed in plaintiff's personnel file, with an acknowledgment of wrongdoing thereupon by plaintiff; however, no such document exists (*Id.* & Massa Aff., 15-21, Exs. E-J).

63.  Disputed. *See* ¶¶45, 46, 48-52, 55-7, *supra*.

64.  Disputed. Among the "paperwork" defendant was required to "submit[] to the insurance company... for continuation of Plaintiff's coverage" was payment for such continuation, and this, according to what plaintiff was told by the insurance company itself, defendant neglected to do (*See* ¶¶45, 46, 48-52, 55-7, *supra*).

65 & 66.  Disputed. *Id.*

67-73.  Admitted.

In addition, plaintiff proffers the following facts:

74.  In or about the fall of 2005, after hearing that defendant, a motorcycle dealership, was preparing to open in the latter stages of 2005, plaintiff, a schoolteacher, motorcycle enthusiast and former motorcycle salesperson for BMW, approached defendant's President and part-owner Meskunas at a motorcycle show to inquire about the part-time position of greeter (Loscalzo Tr. 54-5, 106-13, 120, 218-21, 232; Meskunas Tr. 7-10; Bernbach Dec., Ex. 8).

75.  Meskunas' wife, Denise, is defendant's Vice President and majority owner (Meskunas Tr. 7-8)

19

76.  Plaintiff sold motorcycles for BMW for approximately two years (Loscalzo Tr. 221; Bernbach Dec., Ex. 8).

77.  Upon looking her over and pronouncing her "attractive," Meskunas advised plaintiff that she would "do for the job" of greeter (Loscalzo Tr. 108-9).

78.  Following an interview with Meskunas and his wife in which plaintiff was quizzed about her knowledge of motorcycles, her riding experience and the specific motorcycles she had owned, and during which plaintiff described to Denise her motorcycling-related charitable efforts on behalf of disabled persons and showed Denise a book about women motorcyclists in which such efforts were featured, she was hired for the greeter position, and officially assumed it once the dealership opened for business in November 2005 (*Id*., 110-15; Meskunas Tr. 10, 31-2).

79.  As greeter, plaintiff reported directly to Adrianna Davidson ("Davidson"), co-manager of defendant's motorclothes department (Davidson Tr. 5-6, 22, 24, 41-2, 50).

80.  Davidson was and is a personal friend of Meskunas and his wife (*Id*., 10-11, 58-9, 70-1; Meskunas Tr. 97).

81.  As friends of Meskunas and his wife, Davidson would socialize with them, and at the time of her deposition, Davidson had been out socially with the Meskunas' just three days earlier (Davidson Tr. 1, 10-11).

82.  As greeter, plaintiff was responsible for welcoming customers to the store, for attempting to obtain the customers' names, phone numbers and e-mail addresses for addition to defendant's mailing list, for directing them to wherever in the store they desired to go, for showing them the motorcycles for sale when the store's salespersons were otherwise occupied, and for keeping the premises neat and clean (Loscalzo Tr. 121, 128-29; Meskunas Tr. 32).

83. Plaintiff remained as defendant's greeter for approximately nine months, from November 2005 until August 2006 (Loscalzo Tr. 127; Meskunas Tr. 39, 45-6).

84. Although Meskunas now contends that plaintiff's performance as greeter was unsatisfactory, her direct supervisor during that period of time, Davidson, disagreed, describing plaintiff's performance as greeter as "good." (Meskunas Tr. 34, 40; Davidson Tr. 22).

85. & 86. Omitted.

87. Meskunas contended that plaintiff's supposed poor performance as greeter derived from her frequently arriving at work late and hung over (Meskunas Tr. 34, 38-41).

88. Meskunas never reprimanded plaintiff for reporting to work late (*Id*., 42-3).

89. Meskunas admitted that lateness was a problem with other employees of the store, whose conduct in this regard, though "habitual[]," also precipitated no reprimands from him, facts corroborated by Sforza (*Id*., 41-3; Sforza Tr. 35).

90. Meskunas stressed that lateness was not a terminable offense at defendant (Meskunas Tr. 44, 121-22).

91. Meskunas noted that he had never discharged an employee of defendant for lateness, and hence that plaintiff had not ultimately been fired because of lateness, an admission underscored at his deposition by his counsel, and further corroborated by Sforza in his deposition (*Id*. & Sforza Tr. 35).

92. The time sheets relied upon by defendant to "establish" plaintiff's instances of alleged lateness (Massa Aff., ¶13, Ex. C) merely recorded when plaintiff punched in on the store's time clock, not necessarily when she actually arrived at the premises, which is a significant distinction given that plaintiff explained that she frequently did not punch in

21

immediately upon entering the store, due to the need to tend right away to customers (Loscalzo Tr. 260-61).

93.  As a result, plaintiff was nowhere near as late as defendant alleges, a fact confirmed by DeSimone, who testified, as plaintiff did, that plaintiff was ordinarily on time (*Id*. & DeSimone Tr. 6-7, 30).

94.  DeSimone was second-in-charge of the sales department and possessed supervisory authority over plaintiff when Sforza was absent – a not uncommon occurrence, given that Sforza's primary employment was not with defendant, but with the New York City Fire Department (Massa Tr. 97; DeSimone Tr. 22-3, 34; Sforza Tr. 7)

95.  Both Meskunas and Sforza made clear that all matters of significance concerning an employee's performance were to be noted in writing in the employee's personnel file (Meskunas Tr. 159; Sforza Tr. 38).

96.  Yet, regarding plaintiff's supposed rampant lateness as greeter, there exists no documentation on that score (Massa Aff., ¶¶15-21, Exs. E-J).

97.  Over the entirety of plaintiff's tenure with defendant, there exists but a single documented instance of lateness on her part (*Id*.).

98.  Meskunas claims to have personally observed plaintiff hung over upwards of ten times (Meskunas Tr. 34, 38-9).

99.  Plaintiff denies having ever reported to work hung over (thereby contradicting as well Meskunas' assertion that, in addition to his own observations, plaintiff's hung-over-edness was expressly confirmed to him by plaintiff herself) (Loscalzo Dec., ¶2).

100.  Davidson stated categorically that plaintiff had never demonstrated herself to have

been hung over (Davidson Tr. 24-6).

101.  Davidson added that, while she had never seen plaintiff hung over at work, among the rest of defendant's employees, coming in hung over was a common occurrence (*Id.*, 26).

102.  Plaintiff was never written up nor otherwise cited for her supposed repeated instances of working while hung over (Massa Aff., ¶¶15-21, Exs. E-J).

103.  The first three months of plaintiff's employment with defendant was a probationary period "intended to give new employees the opportunity to demonstrate their ability to achieve a satisfactory level of performance," and to permit defendant "to evaluate employee capabilities, work habits, and overall performance," with defendant reserving the right to terminate the employment of any probationary employee who did not perform satisfactorily at the end of or at any time during that period (Bernbach Dec., Ex. 9).

104.  Plaintiff was not discharged at any point during or upon the conclusion of her probation (Meskunas Tr. 31-2, 157).

105.  In September 2006, defendant promoted plaintiff to salesperson, a full-time position in which, due to one of defendant's two salespersons being out at that time on an extended medical leave, plaintiff would comprise fully one-half of defendant's sales force (Meskunas Tr. 41, 45-7, 50; Loscalzo Tr. 127, 166, 223-24; Sforza Tr. 19-20).

106.  At the time of plaintiff's promotion, Meskunas had been searching for a number of months for a salesperson, but had repeatedly rejected applicants for the post as unsuitable, thereby demonstrating both the exacting standards he applied to the effort to fill that most critical position, and that plaintiff had, given his willingness to hire her therefor, obviously met them (Meskunas Tr. 48).

23

107.  In deciding to promote plaintiff, Meskunas dismissed Sforza's objection to his intention to promote plaintiff, telling Sforza that he believed plaintiff a good candidate for the position (Sforza Tr. 18-19).

108.  Meskunas went out of his way to persuade her to accept the promotion to salesperson, which, in being full-time, would have required her to resign her current full-time post as a teacher, by assuring her that in the sales job she could expect to earn, in salary and commissions, in excess of her schoolteacher's compensation (Loscalzo Tr. 214, 216-17).

109.  From the outset of her employment with defendant as greeter and continuing on through her time as one of its salespersons, plaintiff was subjected to a campaign of sexually harassing comments and actions by Meskunas (Loscalzo Tr. 31-2, 37-8, 101, 156-60, 163-65, 170, 207-8, 211-12, 227-28, 246, 269-73, 275; DeSimone Tr. 38-9, 41, 43-6, 51, 54, 60-2, 64-9, 79-80; Davidson Tr. 6-8, 19-20, 30, 59-60, 64, 69; Griffo Tr. 10-11, 13, 17; Loscalzo Dec., ¶¶3, 4; Bernbach Dec., Exs. 11, 12).

110.  On virtually every day he and plaintiff worked together, Meskunas ogled plaintiff and commented lasciviously upon her "tits" or "boobs" and "ass," his remarks in this regard including: "You have great tits"; "Great ass"; "You have the best ass in the place"; "Michelle, you have bigger boobs than Adri[anna Davidson]" (Loscalzo Tr. 156-59; DeSimone Tr. 51, 54, 60-2, 64-7, 79; Davidson Tr. 6-8, 19-20, 30, 59-60, 64, 69; Bernbach Dec., Ex. 11 *see also* ¶¶113, 114, *infra*).

111.  Meskunas once inquired of plaintiff as to the color of her pubic hair, asking her, "Does your carpet match your drapes?" (Loscalzo Dec., ¶3).

112. Meskunas was a constant presence at defendant, ordinarily working there seven days

24

a week (Massa Tr. 29).

113.  Meskunas specifically drew a link between the size of plaintiff's breasts and her prowess as a salesperson, commenting to plaintiff on an occasion in which a customer left the dealership without buying a motorcycle, "With tits like that you should be able to sell ice to an Eskimo," and opining in another instance, in Davidson's presence, that plaintiff's breasts were large and because of their size, she should be able to do her job very well (Loscalzo Dec., ¶3; Davidson Tr. 7).

114.  Frequently whenever he or plaintiff entered the store, and often in front of customers and other employees, Meskunas would  look her up and down and "thank" plaintiff for wearing certain clothes that he believed accented her breasts and/or buttocks, his remarks in this regard including: "Thanks for wearing that, it shows off your tits" or "boobs"; "You have great boobs, thanks for wearing that"; "Thanks for wearing those jeans, you have a great ass"; "Thanks for wearing that. You have a great ass, those are nice jeans"; "Thanks for wearing that today, you look sexy." (Loscalzo Tr. 157-59, 163; DeSimone Tr. 51, 79-80).

115.  Meskunas repeatedly asked plaintiff to sit on his lap, such often being his response when plaintiff approached him for his assistance with work-related issues (Loscalzo Tr. 101, 160, 246).

116.  Frequently, when plaintiff would come to him in such assistance-seeking instances, Meskunas would respond, "Come here, baby, come sit on my lap and tell me all about it." (*Id.*, 101, 246).

117.  In another incident, witnessed by Human Resources Manager Massa, Meskunas, seated on the stairs between the store's main and upper levels, summoned plaintiff over to him,

saying, "I need to speak to you,"and when plaintiff approached, instead of imparting to her something of a business or otherwise legitimate nature, he continued, "Come, baby, sit on my lap." (*Id.*, 160; Loscalzo Dec., ¶6; Bernbach Dec., Ex. 13).

118.  Meskunas asked plaintiff on many occasions to hug him, and did in a number of instances unwelcomely wrap his arm around her, thereby causing her visible discomfort discernible to those who witnessed these instances (Loscalzo Dec., ¶4; DeSimone Tr. 38-9, 41).

119.  To commemorate defendant's Customer Appreciation Day, Meskunas entered the dealership and, referring to a vendor outside selling baseball cards, advised the entire store: "You know what? That guy just asked me why I hired Mikki [plaintiff's nickname]. I said, 'Because she's got nice tits.'" (Loscalzo Tr. 207-8).

120.  Meskunas propositioned plaintiff to accompany him on a business trip that his wife would not be taking with him and for which plaintiff's presence would serve no business purpose (*Id.*, 101, 275; Loscalzo Dec., ¶5).

121.  Meskunas simulated a sex act while he and plaintiff sat together on a motorcycle; specifically, upon receiving a new motorcycle at the dealership, Meskunas, seated on it near the entrance to the store, asked plaintiff to sit on it with him, ostensibly so she could convey to him how the seat felt for a passenger, but once seated with him, and in full view of numerous customers and members of his staff, Meskunas said, "Oh yeah, Mikki, almost there," and began to rock back and forth as if engaged in sexual intercourse, his body grinding up against plaintiff's, while making moaning and groaning sounds and intoning "Don't stop, don't stop, I'm almost there, keep going," and "Wow, that feels good," (Loscalzo Tr. 31-2, 38, 269-73; DeSimone Tr. 43-6, 68-9; Griffo Tr. 10-11, 13, 17; Bernbach Dec., Exs. 11, 12).

26

122.  Declaring that plaintiff "looked hot on" another motorcycle upon which she was sitting, Meskunas uninvitedly attempted to squeeze onto the seat with her (Loscalzo Tr. 170, 227-28).

123.  Meskunas frequently demeaningly commanded plaintiff to perform such menial tasks as watering the plants, cleaning desks or fetching him a drink because she was "the girl"and that, accordingly, was her "job." (*Id.*, 159).

124.  Though Meskunas frequently subjected plaintiff to the foregoing abuse when it was just the two of them present, he also engaged in such behavior before others, employees and customers alike, and certain of those individuals, namely DeSimone, Meskunas' personal friend Davidson, and customer and member of Meskunas' motorcycle club Albert Griffo, have come forward to corroborate many of plaintiff's allegations, and thereby contradict Meskunas' denials of ever having conducted himself in the sexually harassing manner described above (DeSimone Tr. 38-9, 41, 43-6, 51, 54, 60-2, 64-7, 68-9, 79-80; Davidson Tr. 6-8, 19-20, 30, 59-60, 64, 69; Griffo Tr. 6-7, 10-11, 13, 17; Meskunas Tr. 97, 105-6, 109-17; Bernbach Dec., Exs. 11, 12).

125. Meskunas' sexually offensive behavior extended to other females employees as well, via his commenting regularly and lewdly on the "boobs" and "ass" of Rosie Valasco of the clothing department, and on the "boobs" of employees Emily, Christie, Sara and even his own friend, Davidson – conduct that, again, has been testified to by disinterested third-party witnesses DeSimone and Davidson (DeSimone Tr. 80-1; Davidson Tr. 6-8, 58-9, 61-4; Loscalzo Tr. 25-6; Massa Tr. 45-6).

126.  On numerous occasions throughout her employment with defendant, both as greeter and salesperson, plaintiff registered complaints about the foregoing sexually harassing behavior

27

with Massa, who, by virtue of her position of Human Resources Manager, as well as under

defendant's sexual harassment policy, was designated to receive and investigate complaints of

that nature (Loscalzo Tr. 156-57, 160-61, 238, 245, 274-75, 283, 303; Meskunas Tr. 119-20,

140-41; Massa Tr. 9-10; Loscalzo Dec., ¶¶5, 7; Bernbach Dec., Ex. 12).

     127.  In complaining to Massa, plaintiff conveyed to her the details of the conduct to

which she was objecting (or recounted them, as Massa had personally witnessed certain instances

of that conduct), and that such conduct was unwelcome, offensive and sexually harassing

(Loscalzo Tr. 156-57, 160-61, 238, 245, 274-75, 283, 303; Loscalzo Dec., ¶¶5-7; Bernbach Dec.,

Ex. 13).

     128.  Plaintiff made it abundantly clear to Meskunas that she objected to his sexually

harassing conduct, such as when, in response to Meskunas' simulating a sex act with her on the

back of a motorcycle (*see* ¶121, *supra*), she promptly leapt off the bike, declared to him, "You're

disgusting" and walked away (Loscalzo Tr. 269-73; DeSimone Tr. 43-6; Griffo Tr. 10-11).

     129.  After witnessing Meskunas ask plaintiff to sit on his lap as he lounged on the stairs

between the store's two levels (*see* ¶117, *supra*), Massa remarked to plaintiff, "Well, I guess he'll

never ask me to sit on his lap because I'm too fat." (Loscalzo Dec., ¶6).

     130.  Approximately one week before she would be terminated, plaintiff advised Massa

that she was going to seek legal counsel to explore her rights and the matter of enforcing them on

account of the sexual harassment she had suffered at defendant (*Id.*, ¶7; Loscalzo Tr. 239-41,

263-64).

     131.  Massa now denies having ever received any of the numerous complaints plaintiff

avers she registered with her, just as she denies ever witnessing or otherwise learning of the types

28

of behavior that was the gravamen of those complaints (Massa Tr. 29-34, 40, 47; Massa Aff., ¶25).

132.  DeSimone testified that plaintiff advised him contemporaneously with certain of her complaints to Massa of sexual harassment that she had so complained, just as she had advised him of her complaints to Meskunas about Sforza's stealing her deals and commissions contemporaneously with those complaints, complaints that defendant admits plaintiff made (DeSimone Tr. 33, 57, 67-8; Def. L.R. 56.1 Stmt., ¶36).

133.  Other than the Meskunas', defendant's management team consisted of Sforza, Massa, DeSimone, Davidson and her co-clothing manager Doreen, the service manager, the parts manager and Claudia Raptis ("Raptis"), the administrative manager (Meskunas Tr. 12-13; Massa Tr. 34-5; Davidson Tr. 41-2).

134.  Davidson testified that Meskunas would "regularly" make sexually inappropriate comments in the store, mostly to plaintiff, but to other women as well (Davidson Tr. 6-7).

135.  DeSimone testified that Meskunas had made sexually inappropriate comments to plaintiff "so many times," perhaps even as many as fifty (DeSimone Tr. 41-6, 61, 79).

136.  Once in the position of salesperson, plaintiff applied herself to selling defendant's motorcycles and performed well in this regard, despite a series of obstacles thrown in her path that were clearly meant to ensure her failure (Loscalzo Tr. 39-40, 43-6, 203, 206, 290, 295-98; Sforza Tr. 93-4; DeSimone Tr. 70; Bernbach Dec., Exs. 13, 14).

137.  In his affidavit herein Meskunas alleges that plaintiff sold only nineteen motorcycles during her term as a salesperson (Meskunas Aff., ¶11).

138.  Meskunas misrepresents plaintiff's sales figure, as shown, first, by lists maintained

29

by plaintiff of just some of the customers to whom she sold motorcycles, which lists include

twenty-nine such clients; by a company document that reveals two more such customers; and by

plaintiff's recollection during her deposition of four more, as well as of another to whom she

made a sale, but to whom she did not actually deliver the motorcycle in question, due to her

having been terminated before the delivery date, for a total of at least thirty-six sales (Loscalzo

Tr. 39-40, 43-6, 203, 206, 290, 295-98; Sforza Tr. 93-4; Bernbach Dec., Exs. 14, 15).

139.  During her time as a salesperson, plaintiff was consistently denied credit for sales

she had made, by virtue of Sforza's repeatedly commandeering deals from her so as to keep the

commissions involved for himself, and although some of these instances were corrected by

Meskunas, many were not, which served to skew plaintiff's sales record, in that certain sales she

in fact made were not credited to her (Loscalzo Tr. 49-52, 58, 205, 226-27, 289-92, 296, 298;

Meskunas Tr. 128-29; Bernbach Dec., Ex. 15).

140.  After claiming categorically that a customer named Mark Rios ("Rios") was at all

times his exclusive customer, and thus never plaintiff's, Sforza was confronted with an affidavit

from Rios stating that he had in fact bought his motorcycle not from Sforza, but from plaintiff

(Sforza Tr. 81-3; Bernbach Dec., Ex. 15).

141.  Though, as Sales Manager and plaintiff's direct supervisor, it was Sforza's

obligation to provide training to plaintiff as a sales trainee, and especially one who had no history

selling Harley Davidsons, Sforza refused to discharge this obligation, engaging in no training of

plaintiff (DeSimone Tr. 70; Sforza Tr. 36, 53; Loscalzo Tr. 277).

142.  Sforza withheld not only training from plaintiff, but access to basic sales-related

information such as defendant's inventory lists (Loscalzo Tr. 224).

143.  Sforza admitted that, in light of her having never sold Harley Davidsons before, as a sales trainee, plaintiff was in a "training process," pursuant to which she was "learning a position." (Sforza Tr. 36, 53).

144.  When DeSimone joined defendant, Sforza trained him on the use of both defendant's and Harley Davidson's computer systems, and DeSimone was sent at defendant's expense to off-site training from Harley Davidson (DeSimone Tr. 25).

145.  In exercising supervisory authority over both Sforza and plaintiff, Meskunas was aware of Sforza's abdication of his responsibility to train plaintiff (Meskunas Aff., ¶¶2, 9).

146.  When promoted to the position of salesperson, plaintiff was instructed by Meskunas that, should a customer make an inquiry on a technical matter that she was not able to answer, she was to refer the customer to the service manager (Loscalzo Tr. 249-50).

147.  Plaintiff's failure to complete a number of online training courses also evidenced the virtual total lack of support she received from defendant when she was supposed to be training as a salesperson, in that completion of the courses in question required certain materials not available online, *e.g.* workbooks, reference sources and CDs, and though plaintiff repeatedly requested such materials from defendant, she was never provided with them, thereby necessarily precluding her completion of the courses in question (*Id.*, 247-50, 255).

148.  Even so hamstrung, plaintiff, as personally observed by DeSimone, nevertheless performed the online training (DeSimone Tr. 70).

149.  According to DeSimone, although sometimes without certain technical information that she was denied by virtue of the above and by Sforza's refusal to train her, overall plaintiff knew defendant's product (*Id.*, 71).

150.  In contending that plaintiff was wont to furnish customers with erroneous information about defendant's motorcycles, Meskunas was unable to provide more than a single example of such – an example that, in fact, was no example at all, as the instance in question was one in which the purveyor of inaccurate information about a motorcycle was not plaintiff, but Meskunas himself (Meskunas Tr. 65; Loscalzo Tr. 254-55).

151.  Specifically, Meskunas claimed that plaintiff had advised a customer that a particular motorcycle came equipped with a Global Positioning System, when in fact it did not – only, it was not plaintiff who imparted this erroneous information, but Meskunas, with plaintiff's involvement in the episode restricted to calling the customer at Meskunas' direction to correct his error (*Id.*).

152.  Plaintiff was well regarded by her customers, as evidenced by her high customer service ratings, her receipt of gifts and letters of appreciation from satisfied customers of hers, and by positive reviews of her sales skills that customers imparted to Davidson, who testified that she heard from a number of customers that they "really liked" plaintiff as a salesperson, for a variety of reasons, including her product knowledge (Loscalzo Tr. 252; Davidson Tr. 23).

153.  Despite it being defendant's practice to document all significant performance failings, there exists no documentation whatsoever condemning or criticizing plaintiff's lack of technical knowledge, her failure to complete certain online courses, or the nature or results of her sales efforts (Meskunas Tr. 159; Sforza Tr. 37-8; Massa Aff., ¶¶15-21, Exs. E-J).

154.  In regard to the September 21, 2006 disciplinary memorandum wherein plaintiff was cited for insubordination for delivering a motorcycle to a customer while Sforza was not at work, though Sforza may have instructed plaintiff not to deliver the motorcycle in question

32

without him present, any such instruction was countermanded by Meskunas' direction to plaintiff

to make the delivery – direction that Meskunas imparted to plaintiff quite emphatically, telling

her, " I am the owner, you do as I tell you." – a fact with which Sforza ultimately agreed (after

initially taking the position that, if the recipient of conflicting instructions from him on the one

hand and his boss and the company's owner and President Meskunas on the other, plaintiff was

to follow his, and not Meskunas' directive) (Loscalzo Dec., ¶8; Sforza Tr. 45, 47-8, 50; Bernbach

Dec., Ex. 16).

     155.  Meskunas and Sforza were frequently in conflict as to what actions plaintiff should

or should not take, and Meskunas left no doubt for plaintiff as to what the proper course was in

those instances, telling her in no uncertain terms that, in such cases, plaintiff was to listen to him

and not Sforza (Loscalzo Tr. 203; Loscalzo Dec., ¶8).

     156.  Sforza conceded that he wrote plaintiff up for this "infraction" without knowing

whether Meskunas had directed plaintiff to deliver the motorcycle, as plaintiff asserts he most

certainly did (Sforza Tr. 47; Loscalzo Dec., ¶8)

     157.  When, two months later, the exact same situation arose in connection with the

delivery of another motorcycle to another customer, with Sforza again instructing plaintiff not to

deliver the bike while he was away, and Meskunas again disagreeing, telling plaintiff to proceed

with the delivery, plaintiff again delivered the motorcycle in Sforza's absence and  no

disciplinary memorandum resulted (Loscalzo Tr. 204; Loscalzo Dec., ¶8; Massa Aff., ¶¶15-21,

Exs. E-J).

     158.  In regard to the December 20, 2006 write-up in which plaintiff was cited for

"disregard[ing]" certain "policies and procedures," although the nature of plaintiff's "violation"

is not specified in the document, and while Sforza claimed not to recall the impetus for the write-up, plaintiff did, testifying that it came as the result of her having noted her deals on the deal board in DeSimone's office (Sforza Tr. 52, 65; Loscalzo Tr. 257-58; Bernbach Dec., Ex. 17).

159. Sforza objected to this, erased them from the board and issued the above-referenced memorandum against plaintiff – again, as with the above-discussed motorcycle-delivery incident, without knowing whether plaintiff had been expressly instructed by Meskunas to take the action in question, which she had (Loscalzo Tr. 257-58; Sforza Tr. 65).

160. After Sforza erased her deals from the board and plaintiff went back to Meskunas to confirm his instruction, Meskunas was incredulous, saying to plaintiff, "Well, put them up again. How am I supposed to know what deals are pending?"; plaintiff did and was disciplined by Sforza (Loscalzo 257-58).

161. After initially contending that plaintiff should have followed his direction instead of Meskunas' with regard to the writing of her deals on the deal board, Sforza conceded that that was not in fact the case (Sforza Tr. 65-6).

162. On January 5, 2007, plaintiff was issued a warning for allegedly "fail[ing] to properly log [a customer's] deposit." (Def. Mem. at 18; Bernbach Dec., Ex. 18).

163. In explaining the proper procedure for processing deposits, Meskunas made clear that a deposit must be recorded in either the "deal folder" or on the company's computer system (Meskunas Tr. 56-7).

164. In accusing plaintiff of having failed to properly record the deposit in this particular instance, Meskunas contended that she had failed to make note of the deposit in either of the above-discussed prescribed ways (*Id.*, 57-8, 60).

165. Yet, in the very document disciplining plaintiff for this "failing," it is stated that plaintiff had indeed placed a record of the deposit (in the form of a credit-car receipt, as the deposit had been made by Visa) in the deal folder (Bernbach Dec., Ex. 18), a fact confirmed by defendant in its brief, wherein it states that "the customer's deposit receipt was eventually located in the deal folder." (Def. Mem. at 18-19).

166. Plaintiff also properly recorded the deposit on the company's computer: by running the deposit payment through the dealership's credit card machine, the payment was automatically entered in the company's daily "batch report," a record on its computer system that was maintained by Raptis, the administrative manager, of all credit-card transactions occurring in the store each day, and indeed right upon the credit-card receipt that plaintiff had, per procedure, placed in the deal folder is noted the batch number for the transaction (Loscalzo Tr. 258; Loscalzo Dec., ¶9; Bernbach Dec., Ex.18).

167. Notwithstanding the foregoing, Sforza testified that there was no record of the deposit on the company computer (Sforza Tr. 64).

168. Sforza did admit that the deposit was memorialized in the deal folder, as was noted in the disciplinary warning that he himself authored (*Id*.).

169. After accusing plaintiff of having failed to properly record the deposit in either the deal folder or on the company computer, Meskunas conceded that he did not know if plaintiff had in fact neglected to record the deposit in either of those venues (Meskunas Tr. 59).

170. As for the January 27, 2007 citation of plaintiff for allegedly "failing to disclose information relevant to a motorcycle trade-in," defendant claims that plaintiff, in taking issue with the reduction in the trade-in price offered for the bike in question, deliberately failed to

35

disclose that the customer had withdrawn the bike from the transaction for an unsuccessful attempt to sell it on eBay (*Id.*, 66, 70-2; Def. Mem. at 19).

171.  In fact, plaintiff had never been advised that the bike had been removed from the transaction, to sell on eBay or for any other reason, and thus could not have willfully withheld such information from Meskunas (Loscalzo Dec., ¶10).

172.  The customer in question had placed a deposit on a particular motorcycle several months before the motorcycle came into the dealership, and had based the amount of the deposit on the trade-in value he was quoted at the time (*Id.*).

173.  During the several-month lag between placement of the deposit and the arrival of the motorcycle he desired, the customer never, as Meskunas asserts, withdrew the trade-in from the transaction, as evidenced by the fact that he had during that time neither retracted the deposit he had specifically calculated on the basis of the trade-in nor advised plaintiff that he was removing the trade-in from the transaction, even as he apparently, and unbeknownst to plaintiff, sought to sell the trade-in bike on eBay (*Id.*).

174.  Thus, when the customer returned to complete the transaction, and Sforza quoted him a lower trade-in price, plaintiff genuinely viewed this as an arbitrary reduction that did not reflect the original terms of the deal and thus jeopardized the deal (*Id.*).

175.  Even though the customer's attempt to sell the trade-in bike on eBay eventually came to light, that did nothing to change the state of the information under which plaintiff was operating when she went to Meskunas to seek enforcement of the original terms of the deal, so that she could not have "lied" to Meskunas on this score (*Id.*).

176.  Although plaintiff explained all of this to Meskunas, and though he ultimately took

36

action on the deal that clearly evidenced an acceptance of plaintiff's account, namely approving the original trade-in price plaintiff had quoted, he nevertheless wrote up a false charge against plaintiff for having "lied" to him (*Id.* & Meskunas Tr. 73; Bernbach Dec., Ex. 19).

177.  The February 4, 2007 disciplinary memorandum arising from plaintiff's alleged sale of a motorcycle without disclosing to the customer that the front fender had been repainted is contrived, as plaintiff not only did conduct that transaction – Sforza did – but was not even present at the store that day, having been out sick (Loscalzo Dec., ¶11; Bernbach Ex. 20).

178.  With respect to plaintiff's failure to return a chair she had borrowed from Sforza's office, though defendant frames this matter as an alleged violation by plaintiff of a directive from Sforza "not to remove items from either the business manager's or the sale[s] manager's office," Sforza testified that plaintiff was in fact authorized to borrow the chairs (Sforza Tr. 71-2; Def. Mem. at 19).

179.  Despite it being defendant's practice to document all significant performance failings, no disciplinary memoranda exist in regard to the matter of plaintiff's failing to return the borrowed chair (Meskunas Tr. 159; Sforza Tr. 38; Massa Aff., 15-21, ¶¶Exs. E-J).

180.  Although she as a salesperson was expected to meet with customers at her desk, plaintiff, unlike everyone else in the store, did not have chairs at her desk to accommodate her customers, despite her months-long requests for chairs from both Sforza and Meskunas (Loscalzo Tr. 301; Sforza Tr. 77).

181.  Defendant was aware that Sforza continuously antagonized plaintiff – and in fact did more than that, as he on many occasions drove plaintiff to tears – as confirmed by Massa, who admitted that, with respect to his treatment of plaintiff, Sforza had been "counseled on his

management skills" and plaintiff's "complaints [about his management of her] were addressed very seriously." (DeSimone Tr. 69-70; Massa Tr. 25-6; Bernbach Dec., Ex. 13; Def. Mem. at 19).

182.  In regard to the September 3, 2006 warning for lateness on plaintiff's part, defendant has expressly disclaimed lateness as a reason for plaintiff's discharge (Meskunas Tr. 44, 121-22; Sforza Tr. 35).

183.  The September 3, 2006 warning also cites plaintiff for having arrived at work without "appropriate business attire," a reference to her having worn sneakers into the store with the pair of shoes she planned to change into in her hand (Loscalzo Tr. 259; Bernbach Dec., Ex. 21).

184.  Meskunas admitted that plaintiff's conduct in regard to her footwear in the above instance was "perfectly acceptable." (Meskunas Tr. 80).

185.  After registering numerous complaints with Massa about the sexual harassment Meskunas constantly directed at her, in late January 2007, plaintiff advised Massa that she was going to consult a lawyer to explore her rights and the matter of enforcing them against defendant on account of Meskunas' conduct (Loscalzo Tr. 239-41, 263-64; Loscalzo Dec., ¶¶5, 7).

186. Plaintiff had already met with an attorney for those purposes (right before approaching Massa in this regard), but had taken the above tack with Massa because plaintiff was not sure she could trust Massa with that information (Loscalzo Tr. 239-41, 263-64; Loscalzo Dec., ¶7).

187.  Approximately one week after plaintiff informed Massa of her intention to consult a lawyer about Meskunas' sexual harassment, on February 8, 2007, Meskunas and Massa informed plaintiff of the decision that they, along with Sforza, had reached, namely that she was being

terminated (Loscalzo Tr. 240; Meskunas Tr. 121; Massa Tr. 66; Loscalzo Dec., ¶7).

188.  In terminating plaintiff, Meskunas proffered as the cause for the discharge none of the litany of "reasons" defendant now presses, but rather merely the observation that "it just didn't work out." (Loscalzo Tr. 251).

189.  In response, plaintiff stated that half of it was her fault, a reference not to anything having to do with her performance, but rather to her regret that she had not stood up for herself more forcefully in the face of Meskunas' sexual harassment and Sforza's various shenanigans (*Id.*, 246, 250-51).

190.  During the termination meeting, Massa volunteered that she would be "happy" to give the allegedly poor-performing plaintiff "a good recommendation for another job" if she needed it (*Id.*, 256).

191.  Less than two weeks later, by letter to Meskunas dated February 20, 2007, plaintiff's counsel advised defendant that plaintiff intended to sue it for sexual harassment (Bernbach Dec., Ex. 22).

192.  On February 23, because she considered Massa friend, plaintiff called Massa to tell her personally of her intention to sue defendant, before she found out from Meskunas (*Id.*, Ex. 13; Loscalzo Tr. 240-42, 244).

193.  However, having been the one to first read the letter from plaintiff's counsel – which letter she brought immediately to Meskunas' attention – Massa had already found out, which prompted plaintiff to apologize to her in an e-mail later that same day "for not telling you sooner," a reference to what Massa had learned by way of the letter that plaintiff had hoped to preempt with her call, that plaintiff had actually gone to see a lawyer and decided to pursue legal

action against defendant, and not in any way indicating that this was the first time ever that plaintiff had apprised Massa of Meskunas' sexual harassment of her (Loscalzo Tr. 240-42, 244-45; Massa Tr. 49-50; Meskunas Tr. 84; Bernbach Dec., Ex. 13).

194.  In the exchange of e-mails between plaintiff and Massa that thereafter ensued, Massa reveals the reason she is now lying about having received complaints from plaintiff and having observed Meskunas' unlawful conduct toward plaintiff, as encapsulated in her admonition to plaintiff that, in "going after a small business owner," she "ha[s] put my job and everyone else's here in jeopardy." (Bernbach Dec., Ex. 13).

195.  When plaintiff began at defendant as its greeter, she was subjected to flirtatious behavior by Sforza that included his commenting about how good she looked and inquiring into her personal and romantic life, such as by quizzing her on her nightlife activities and whether she was dating anybody (Loscalzo Tr. 146-48; Loscalzo Dec., ¶12).

196.  Not interested in pursuing matters of this sort with Sforza, plaintiff rebuffed his flirtations (*Id.*).

197.  Toward the end of her tenure with defendant, while plaintiff was in Massa's office along with Massa, Sforza, DeSimone and another employee named Heather Webb ("Webb"), Sforza, as he embraced Webb, remarked to plaintiff, "If you had shown me the same kind of loving, things might have been different." (DeSimone Tr. 73-4; Loscalzo Dec., ¶12).

198.  As a result of Meskunas' sexual harassment of her, plaintiff has submitted to counseling, developed and been diagnosed with depression and physical manifestations of her resulting distress such as gastric ailments, and been prescribed various medications to treat her psychological distress (Loscalzo Tr. 81, 84-91, 95, 97-101, 103).

Dated: White Plains, New York
        January 10, 2008

                                        BERNBACH LAW FIRM PLLC


                          By:     s/ Jason Bernbach
                                  Jason Bernbach (JLB-3392)
                                  Jeffrey M. Bernbach (JMB-5131)
                                  245 Main Street
                                  White Plains, New York 10601
                                  (914) 428-9100
                                  Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of Plaintiff's Statement Pursuant to Local Rule 56.1 was served by Federal Express on Putney, Twombly, Hall & Hirson LLP, attorneys for defendants, 521 Fifth Avenue, New York, New York 10175, on the 10th day of January, 2008.

<u>s/ Jason Bernbach          </u>
Jason Bernbach (JLB-3392)