UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- x
MICHELLE LOSCALZO,                :

                                     :     07 Civ. 3046 (CLB)

                Plaintiff,     :

                                     :

-against-                           :

                                   :     **DECLARATION**

                                   :

NEW ROC MOTORCYCLES, LLC,     :     FILED VIA ECF

                                   :

                Defendant.    :
--------------------------------------------------------------- x

MICHELLE LOSCALZO declares under penalty of perjury, pursuant to 28 U.S.C. §1746, that the following is true and correct:

1. I am the plaintiff in the above-captioned action, am fully familiar with the facts and circumstances herein, and submit this declaration in opposition to the motion for partial summary judgment of defendant New Roc Motorcycles, LLP ("Defendant").

2. In my time as defendant's greeter, I never reported to work hung over, nor obviously then ever stated to defendant's President and part-owner John Meskunas that I was hung over at work.

3. Among the numerous sexually harassing comments Mr. Meskunas made to me during my tenure with defendant was one that followed the departure from defendant's store of a customer who had failed to purchase a motorcycle. After the customer left, Mr. Meskunas, in one of his incessant and crude references to my anatomy, remarked to me, "With tits like that you should be able to sell ice to an Eskimo." Also among the numerous sexually harassing comments Mr. Meskunas made to me while I was employed by defendant was one in which he inquired as

to the color of my pubic hair, asking me, "Does your carpet match your drapes?"

4. Among the sexually harassing actions Mr. Meskunas engaged in toward me during my tenure with defendant were his asking me on numerous occasions to hug him, and in a number of instances when I declined or just out of the blue, his unwelcomely wrapping his arm around me.

5. On numerous occasions throughout my employment, both as greeter and salesperson, I complained to Patricia Massa, defendant's Human Resources Manager and an individual designated under defendant's sexual harassment policy to receive and investigate complaints of sexual harassment, about the sexually harassing behavior of the type described above and in more detail in my deposition testimony to which I had been subjected by Mr. Meskunas. In complaining to Ms. Massa about Meskunas' conduct, I conveyed to her the details of the conduct to which I was objecting (or recounted them, as Ms. Massa had personally witnessed certain instances of that conduct), and that I found such conduct unwelcome, offensive and sexually harassing.

6. Ms. Massa was present during one of the instances in which Mr. Meskunas asked me to sit on his lap, specifically one in which he, while sitting on the stairs between the store's main and upper levels, beckoned me over and, when I arrived, said, "Come, baby, sit on my lap." After witnessing this, Ms. Massa remarked to me, "Well, I guess he'll never ask me to sit on his lap because I'm too fat."

7. At the end of January 2007, after enduring many months of Mr. Meskunas' sexually harassing behavior toward me, and just a week, it would turn out, before I was terminated, I consulted an attorney about the legal ramifications of that behavior, specifically about my rights under the laws prohibiting that kind of conduct, and about potentially pursuing legal action

2

against defendant on the basis of the conduct. Very shortly after that consultation, I advised Ms.
Massa that it was my intention to seek legal counsel for the reasons set forth above. Although I
had actually already consulted with an attorney in that regard, I was unsure I could trust Ms.
Massa with that information, so I framed the matter as something I was going to do in short
order.

    8. In support of its motion, as supposed proof of my poor performance, defendant relies
on an instance that led to a September 21, 2006 disciplinary memorandum against me. Defendant
completely misrepresents that instance, omitting facts that show my conduct in regard to that
instance to have been completely proper, and known by it to have been proper. Specifically, I had
sold a motorcycle to a customer named William Colish, and Sales Manager Wayne Sforza had
told me not to deliver the motorcycle to Mr. Colish when he, Mr. Sforza, was not present at the
dealership. However, with the motorcycle fully paid for and prepared for delivery, Mr. Meskunas
directly instructed me to deliver the motorcycle to Mr. Colish, notwithstanding the fact that Mr.
Sforza was not on the premises that day. When I advised Mr. Meskunas of Mr. Sforza's contrary
direction, Mr. Meskunas left not doubt as to whose instructions I was to follow, telling me
emphatically, "I am the owner, you do as I tell you." Mr. Meskunas' statement in this regard
echoed similar ones he had made to me; it was not uncommon for Mr. Meskunas and Mr. Sforza
to disagree as to what actions I should or should not take, and in such instances Mr. Meskunas
had made it perfectly clear to me that, as he was the owner of the dealership, I was, in such cases,
to listen to him and not Mr. Sforza. Thus, in offering as supposed proof of my poor performance
the incident underlying the September 21, 2007 memorandum, defendant is relying on an
instance in which Mr. Meskunas personally knows me to have acted properly. In fact, when two

3

months later, the same situation arose in connection with the delivery of a motorcycle to another of my customers, with Mr. Sforza again telling me not to deliver the bike when he was away, and I again following Mr. Meskunas' contrary direction to deliver the motorcycle in Mr. Sforza's absence, I was not written up.

9. As further "proof" of my poor performance, defendant points to my supposedly failing to follow procedure with respect to the recording of deposits, which "failure" led to a January 5, 2007 disciplinary memorandum. Pursuant to defendant's procedure for recording deposits, deposits were to be recorded in the deal folder or on the company's computer system. The deposit in question was absolutely logged onto the company's computer system. In making the deposit by credit card, the customer's credit card was run through the company's credit card machine, which automatically caused the deposit to be recorded in that day's batch report, a log of all credit-card transactions occurring in the store each day that was maintained by Administrative Manager Claudia Raptis.

10. Defendant also offers as "proof" of my poor performance an instance in which I supposedly withheld from Mr. Meskunas relevant information about a trade-in motorcycle, and that led to a January 27, 2007 disciplinary memorandum against me. Again, I quite simply did not do what I was accused of in that memorandum, and defendant knows this, as I explained the facts underlying the instance in full to Mr. Meskunas. Specifically, the customer involved in the deal placed a deposit on a particular motorcycle several months before it was due to arrive at the dealership. Before the customer placed the deposit, I had quoted him a price for a motorcycle he intended to trade-in on the new bike, and the customer in turn had calculated the amount of the deposit he left on the new bike specifically on the basis of the quoted value of the trade-in

4

motorcycle. In the several months that then passed between the customer's placement of the deposit, the customer never, as defendant now asserts, withdrew the trade-in motorcycle from the transaction. Not only did the customer never in any way advise me that he had withdrawn the trade-in from the deal, much less do so to attempt to sell the bike himself on eBay, but he had never at any point in the interim revoked or altered the deposit he had left that had been specifically arrived at on the basis of there being a trade-in involved in the deal and the value of that trade-in as quoted to him at or about the time of the deposit. Although it would ultimately come to light that the customer had apparently attempted to sell the trade-in motorcycle on his own by way of eBay, I never knew of this. Accordingly, when the new motorcycle came in and the customer returned to the dealership to complete the deal, and Mr. Sforza at that time quoted him a different, and lower, trade-in price than I had initially quoted him, it appeared to me that Mr. Sforza was reneging on the deal I had originally made with the customer in regard to the trade-in, and thereby jeopardizing the entire sale. Thus, in lobbying Mr. Meskunas to enforce my deal as originally struck, I did so fully believing – as I had, as discussed above, been given no reason to believe otherwise – that that deal was still in place. When it was revealed that the customer had, in the intervening months, attempted to sell the trade-in motorcycle on eBay, that did nothing to change the fact that he had done so without ever telling me that he was doing so or going to do so, or that he had withdrawn the trade-in from the deal. In discussing the matter with Meskunas, I made all of the foregoing clear to him, so that when he subsequently accused me of deliberately withholding from him the "fact" that the customer had withdrawn the trade-in from the deal in order to sell it himself on eBay, he did so knowing full well that I had done nothing of the sort, as I could not have withheld from him information that was in part untrue (that the

5

trade-in had been withdrawn from the deal) and in part utterly unknown to me (that the customer had endeavored to sell the trade-in on eBay).

11. As further "proof" of my supposed poor performance, defendant relies on a February 4, 2007 disciplinary memorandum against me that it claims was precipitated by my alleged sale of a motorcycle without disclosing to the customer that the front fender had been repainted. However, defendant knows this to be false as well, as I did not sell the motorcycle in question – Mr. Sforza did. In fact, I was not even at the store on the day of the sale in question, having been out sick.

12. When I began at defendant as its greeter, I was subjected to flirtatious behavior by Mr. Sforza that included his commenting about how good I looked and inquiring into my personal and romantic life, such as by quizzing me on my nightlife activities and whether I was dating anybody. Not interested in pursuing matters of this sort with Mr. Sforza, I rebuffed his flirtations. Then, toward the end of my tenure with defendant, while I was in Ms. Massa's office along with Ms. Massa, Mr. Sforza, defendant's Finance and Insurance Manager Tony DeSimone and another employee named Heather Webb, Mr. Sforza, as he embraced Ms. Webb, remarked to me, "If you had shown me the same kind of loving, things might have been different."

13. In the affidavit he has submitted in connection with defendant's motion, Mr. Meskunas relates an instance in which he ran into me in a restaurant on the evening of a day that I had called in sick. I had called in sick that day – only one of two times that I called in sick during my entire year-plus tenure with defendant – but, feeling better many hours later, I did go to the restaurant. However, in encountering Mr. Meskunas at the establishment, I never in any

6

way told him, as he now alleges, that I "had not been sick and had simply not felt like working

that day," or anything like that.

I declare under penalty of perjury under the law of the United States of America that the

foregoing is true and correct.

Date: Bronx, New York
    January 7, 2008

MICHELLE LOSCALZO

7

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the Declaration of Michelle Loscalzo was

served by Federal Express on Putney, Twombly, Hall & Hirson LLP, attorneys for defendant, 521

Fifth Avenue, New York, New York 10175, on the 10th day of January 2008.

s/ Jason Bernbach
Jason Bernbach (JLB-3392)