EXHIBIT 3

# Davidson Transcript

Adriana Davidson

1                    Davidson

2 greeter; am I correct?

3      A.    Correct.

4      Q.    Did you ever see her come in late

5 when she was a salesperson?

6      A.    Yes, I have.

7      Q.    So she came in late at both times.

8      A.    Um-hmm.

9      Q.    At any time, whether as a greeter

10 or as a salesperson, did she ever appear to

11 you to be hung over?

12     A.    No.  We all came in hung over at

13 one point or another.  I don't know

14 necessarily if she did.

15     Q.    Well, let me ask you this.  Did you

16 ever speak to her about whether or not she

17 was hung over?

18     A.    No.

19     Q.    You never talked about it?

20     A.    It's not my business.

21     Q.    So you never asked her any

22 questions about whether she was hung over?

23     A.    No.

24     Q.    How frequently was she late when

25 she was a greeter?

Adriana Davidson

Page 27

Davidson

1

2    A.    Quite a bit.

3    Q.    **Well, how long a period of time did**
4 **you supervise her when she was a greeter?**

5    A.    That's what I'm trying to think of,
6 how long.  I would say out of a 30-day month,
7 and she only worked as a greeter on the
8 weekends, more than half of the time she was
9 late.

10    Q.    **So if there are ten days, in a**
11 **weekend, five weekends, two days a weekend,**
12 **she worked both days on the weekend?**

13    A.    Correct.

14    Q.    **More than 50 percent of the time --**

15    A.    I would say.

16    Q.    **-- at least five days she would be**
17 **late?**

18    A.    Yes.

19    Q.    **And then she became a salesperson?**

20    A.    Correct.

21    Q.    **Did you notice that the lateness**
22 **increased in frequency?**

23        MR. BERNBACH:  Object to the form.

24    A.    I didn't notice.  I was told by
25 other people that she was late, because,

**ESQUIRE DEPOSITION SERVICES, LLC.**
**1-800-944-9454**

# DeSimone Transcript

30

1  the time, just acquaintances.

2      Q.    When Mikki returned from her vacation

3  towards the third week of August, that's when she

4  started full-time?

5      A.    Yes.

6      Q.    As a salesperson?

7      A.    Right.

8      Q.    You testified that you didn't like the

9  way Wayne treated Mikki. Was this from the start,

10 when she first started?

11     A.    Pretty much.

12     Q.    Other than comments to her that he didn't

13 want her working there, do you recall anything else

14 he had said to her?

15     A.    .Well, one day she came into work about 10

16 minutes late and he just pretty much came out and

17 told her to go home because she was 10 minutes late.

18     Q.    Was that a rare occasion for her to be

19 late?

20     A.    Usually she wasn't late, she was -- most

21 of the time she was on time. I mean, I don't even

22 recall -- 10 minutes, that's not really late in my

23 opinion, so --.

24     Q.    Do you know how many days a week Mikki

25 worked?

31

1      A.    Five, everybody worked five.

2      Q.    What happened when he told her to go

3  home?

4      A.    She broke down and started to cry, and I

5  don't know from there where she went to, but I

6  believe Denise got involved in it and she went over

7  to Wayne and pretty much told Wayne, "You can't send

8  a person home for being 10 minutes late," and she

9  ended up staying.

10     Q.    How are you aware of what happened?

11     A.    I was standing there.

12     Q.    Excuse me?

13     A.    I was standing there.

14     Q.    Standing where?

15     A.    In the vicinity where I heard the whole

16 thing.

17     Q.    Where did it happen?

18     A.    Right in the middle of the showroom. She

19 was walking in to go punch in and Wayne and I were

20 standing on the stairs and that's when the whole

21 thing started.

22     Q.    The stairs going up to the second floor?

23     A.    Second level, yeah.

24     Q.    Second level. What time was it?

25     A.    About 10 after 9.

32

1      Q.    Was she scheduled --

2      A.    Wait a minute. Ten after 9 or 10 after

3  10, I'm not even sure now. I'm not sure of the

4  exact time, but it was 10 after whatever time she

5  was supposed to be there.

6      Q.    Do you recall when this occurred?

7      A.    I don't remember the month, no.

8      Q.    Do you remember what day of the week it

9  was?

10     A.    No, don't recall that.

11     Q.    Did Wayne say anything to you after

12 Denise spoke to him?

13     A.    No, no.

14     Q.    Any other comments that you can recall?

15     A.    One day she came in wearing sneakers. He

16 didn't like that, so he told her not to do it

17 anymore and she stopped doing it, I guess, because I

18 didn't hear any other comments about sneakers after

19 that.

20     Q.    Anything else?

21     A.    No, not -- not to my knowledge, you know

22 for that, you know, that part of it, no.

23     Q.    Did you ever hear Mikki make any comments

24 about Wayne?

25     A.    Yeah, only that he was real rough on her

33

1  a lot of times. She also confided in me that he was

2  stealing part of her deals, if not all of it

3  sometimes and, you know, she just had a tough time

4  there, that's -- if I was her, I would have left way

5  earlier, but she had nowhere to go.

6      Q.    What did you say to her when she said --

7  when she told you that he was stealing part of her

8  deals?

9      A.    I told her she should really go see Jack,

10 the owner, because that's the only person that would

11 be able to help her, and he did get involved a lot

12 of times and actually paid her either partial or --

13 if not all, I'm not sure. That, I don't know.

14     Q.    Of the commissions owed?

15     A.    Yes.

16     Q.    How do you know that he did that?

17     A.    Michelle had told me that.

18     Q.    Did you say anything to Jack about Mikki

19 complaining about Wayne stealing the commissions?

20     A.    No, not that I can recall.

21     Q.    Why not?

22     A.    Because it wasn't my position to -- you

23 know, it wasn't, you know, it wasn't up to me to say

24 anything, it's actually up to her. I mean, if he

25 did something with my salary, I would say something.

# Loscalzo Transcript

32

had witnessed?

          A.    No, but he saw that I was upset by that.

          Q.    He told you that?

          A.    Yeah, I was clearly upset.  I walked
away.

          Q.    When did this event allegedly occur?

          A.    Sometime in the fall of 2006, I believe.
I'd have to check.

          Q.    2006?

          A.    I'm sorry, 2006.

          Q.    Fall of 2006?

          A.    But I'd have to check.  Honestly, I'd
have to check.

          Q.    When you say you have to check --

          A.    I have my own personal records, I have it
somewhere.

          Q.    When you say you have your own personal
records, what records are you referring to?

          A.    Journal I kept.

          Q.    Did you provide that journal to your
attorney?

          A.    Yes.

          Q.    Is it a written book?

          A.    No.

          Q.    Where is it maintained?

1    Q.    I'm showing you Defendant's Exhibit 5 for

2  identification.  Can you tell me what that is?

3    A.    Also part of my desk calendar.

4    Q.    For what month?

5    A.    November 2006.

6    Q.    Anything on that calendar that references

7  the incident we are speaking about?

8    A.    No.

9        MS. DONNELLY:  Could you mark that,

10  please?

11        (One-page December '06 Calendar is

12  received and marked Defendant's Exhibit 6 for

13  identification.)

14    Q.    I'm showing you Defendant's Exhibit 6 for

15  identification.  Can you tell me what that is?

16    A.    It's December 2006 from my desk calendar.

17    Q.    Is there anything on that calendar that

18  references the incident we're discussing?

19    A.    No.

20    Q.    Are there any other documents that you

21  have maintained that references the incident on the

22  motorcycle?

23    A.    Not that I recall.

24    Q.    To the best of your recollection, this

25  incident allegedly occurred in the fall of 2007?

237

the typed sheet.

  Q. You did the --

  A. Typed journal.

  Q. And the calendar where you recorded your interactions with Wayne?

  A. Yes.

  Q. Did you do anything similar for the comments made to you by Jack?

  A. No.

  Q. Why not?

  A. I just didn't.

  Q. Why not?

  A. I just didn't.

  Q. Why did you record it with respect to Wayne?

  A. I just did.

  Q. When were the writings made on the calendar?

  A. As they happened.

  Q. Contemporaneously with whatever was going on you wrote it down?

  A. Uh-hum.

  Q. I know we went over this already in the beginning in your first day of deposition, there's nothing on there about Jack in any of your

1  calendars, correct?

2       A.   Right.

3       Q.   A lot of information on there about

4  Wayne?

5       A.   Right.  I made verbal complaints to Patty

6  about Jack.

7       Q.   I know that's your claim.

8       A.   Yes.

9       Q.   Since you bring that up, why don't we go

10  to the e-mail.

11            MS. DONNELLY:  Let's mark this.

12            (Document, Bates P00132-133 is received

13  and marked Defendant's Exhibit 28 for

14  identification.)

15       Q.   I ask you to just take a look at that

16  first.

17       A.   Uh-hum.

18       Q.   You know how e-mail chains go, the last

19  is the first, so can you turn to the first one?  It

20  says, "From mcmikki@aol.com.", I'm assuming that is

21  you.  Is that assumption correct?

22       A.   Yes.

23       Q.   "To pm@" New Roc Harley-Davidson?

24       A.   Uh-hum.

25       Q.   "Hi, Patty.  I hope I have not made

239

1   anything uncomfortable for you at work, that is

2   clearly not my intention.  I hope you understand

3   that I had to take action.  I also want to apologize

4   for not telling you sooner and for saying anything

5   about it on the phone today.  I hope we can maintain

6   our friendship and keep New Roc and this situation

7   out of it.  Mikki."

8           What prompted this e-mail to Patty?

9       A.   Well, I had told Patty that I had already

10  consulted a lawyer before I was fired.  She knew

11  that because I kept going to her and saying that I

12  was -- felt uncomfortable.  Anytime I had a

13  complaint with Wayne, I would go to Jack and he

14  would make some comment that made me feel

15  uncomfortable.  At that point in December that I

16  went to seek legal counsel --

17      Q.   I'm sorry, you did give me the name of

18  that legal counsel.  And who was that?

19      A.   Leonard Flamm.

20      Q.   Do you recall the day on which --

21      A.   I believe it was sometime in December.

22      Q.   Is that recorded on your calendar

23  anywhere?

24      A.   No.

25      Q.   You claim that you told Patty about that

If Wayne denied you a day off, you went to Jack and he gave you the day off?

A.    Yes.

Q.    If Wayne denied a commission, you went to Jack and he gave you a commission?

A.    Yes.

Q.    So how did Jack -- what was your testimony?

A.    That in front of Wayne he would degrade me.  If I went to him alone, we could have a conversation.

Q.    Is Patty's statement true that Jack tried to do everything he could to give you an opportunity to succeed?

A.    No.

Q.    What did he not do?

A.    First of all, the training, the nine classes, with each online class, there was resource or reference materials that had to be supplied with them, you had to read a booklet or a workbook in order for you to answer the questions and there were often times when you could not answer the question. I would go to the mechanics or Wayne or Jack or the service manager and ask them if they knew the answers.  They didn't know them either.

1    Q.    For the online training classes?

2    A.    Yes.

3    Q.    It's your testimony that all the online

4  training courses, the materials are not online?

5    A.    The materials are online, you have to

6  read the information, but with each online class,

7  there's other reference material that is supposed to

8  accompany it.  Workbooks, other reference materials,

9  other CDs that did not come with it.  I often

10  requested them from Claudia Raptus and from Dave

11  DiLeo and they both told me they were not going to

12  get them.

13    Q.    There were two different sets of training

14  materials, weren't there?  There were online

15  training materials which you could do online and in-

16  store training materials of which one was missing?

17    A.    No, the online training classes had other

18  reference materials that accompanied them.

19    Q.    That's your testimony?

20    A.    That is my testimony --

21    THE WITNESS:  -- and I witnessed on the

22  test, that test --

23    MR. BERNBACH:  Everything you say she

24  takes down.

25    Q.    Individuals, other sales people have

1   taken the online training without the additional

2   material?

3          MR. BERNBACH:  Objection.  How does she

4   know what they did?  She can't answer that.

5      A.   I know --

6          MR. BERNBACH:  Wait a minute.  If I tell

7   you don't answer, you don't answer.  You don't know

8   what the other people did.

9          THE WITNESS:  No, no, no, but --

10         MR. BERNBACH:  Let her ask the question.

11     Q.   Is it possible to complete the online

12  training courses without any of the additional

13  materials to which you referenced?

14     A.   No, no, not if it's supposed to be

15  completed with that other reference material and for

16  a trainee like myself, then no, I had to be supplied

17  with sufficient reference materials to take those

18  online classes.

19     Q.   You just testified that as someone who

20  had ridden a motorcycle for eight years, you were

21  qualified to be a salesperson, would be qualified to

22  be a salesperson?

23     A.   I was qualified.  However, some of those

24  questions were --

25     Q.   Those technical questions are part of

256

1   whether or not it had a GPS system?

2       A.   It was not on the motorcycle, no, you

3   know, the actual piece was not --

4       Q.   Anything else that was said during your

5   termination meeting?

6       A.   Patty said that she would be more than

7   happy to give me a good recommendation for another

8   job if I needed it.

9       Q.   Anything else?

10      A.   She also said she knew it was a no win

11  situation for me.

12      Q.   Anything else?

13      A.   No, but as Jack stated in his deposition,

14  that I said, "Spare me the gory details," I never

15  said that.  That was never, ever said by me.

16      Q.   You said you were shocked that you had

17  been terminated?

18      A.   Uh-hum.

19      Q.   You had been getting disciplinary actions

20  up until that point, had you not?

21      A.   Yeah, but they were for wearing sneakers,

22  things like that.  That wasn't severe.

23      Q.   Wearing sneakers, you don't consider that

24  to be severe?

25      A.   I wore sneakers once, so then I never did

1  connection with that?

2       A.   I can't prepare a deal folder if I don't

3  know which motorcycle is being purchased.

4       Q.   There was no deal folder?

5       A.   No.  You know, I made a folder, but

6  inside it had the receipt that the $500 was taken

7  and a note, a specific note stating the

8  circumstances involved with it.

9       Q.   Did you maintain a copy of that note?

10      A.   Wayne had it.

11      Q.   You may have disagreed with the

12  write-ups, I understand that, but you did receive

13  four write-ups in six months, correct?

14      A.   I don't agree with all of those write-ups

15  at all.

16      Q.   That wasn't my question.  My question

17  was:  You received four write-ups in six months?

18      A.   Yes.

19      Q.   Do you consider that to be a lot?

20      A.   No.  Two of them were bogus, so no.

21      Q.   Of course you disagreed with them, you

22  didn't consider them to be a lot?

23      A.   Being written up for wearing sneakers

24  when I've got my shoes in my hand is a bogus

25  write-up.

1    Q.    Okay.  What about attendance, were you

2    late often?

3    A.    I was late occasionally, yes.

4    Q.    Define "occasionally" for me.

5    A.    Once a week.  I was also living in

6    Rockland for a period of time.  Every time that I

7    was going to be late, I called Wayne on the phone,

8    on his cell phone and told him that I was stuck in

9    traffic.  I called the store, I'd left Patty --

10   Q.    You notified him you would --

11   A.    I notified them.

12   Q.    At least once a week?

13   A.    There's nothing I can do when I'm stuck

14   in traffic.

15   Q.    You could leave earlier --

16   A.    I could.

17   Q.    -- if it was a regular occurrence, but

18   you didn't?

19   A.    No, I did.  I wasn't always late.

20   Q.    Once a week?

21   A.    Not always.  Sometimes once a week.

22   Q.    Sometimes more than once a week?

23   A.    No, sometimes none at all.

24   Q.    Sometimes not at all?

25   A.    Sometimes not at all.

1    A.    The Amended, it states that I sought

2    legal counsel in January 2007.

3    Q.    That wasn't in the original, correct?

4    A.    Right.  It looks similar, so --

5    Q.    Do you know why your claim that you

6    sought legal counsel in January 2007 was omitted

7    from your original Complaint?

8    A.    I don't know.

9    Q.    Did you, in fact, seek legal counsel in

10    January 2007?

11    A.    I said -- Leonard Flamm, I think I said

12    December.  It was January, that's what it was, yeah.

13    Q.    Do you have any record of the date on

14    which you met with that attorney?

15    A.    No.  I suppose I could find out.

16    Q.    I'm going to request that you provide --

17    that I be provided with any record that you have --

18    A.    Okay.

19    Q.    -- of that date.

20    A.    Okay.

21    Q.    Did you have to pay for that

22    consultation?

23    A.    No, I didn't.

24    Q.    You now believe that meeting to have

25    occurred in January 2007?

1    A.    Yes.

2    Q.    -- about Jack's comments?

3    A.    Yes.

4    Q.    Did you ever complain to Jack?

5    A.    No, but in a case like that, I told him

6  he was disgusting when he said -- he asked if, you

7  know, said about the business trip, the dealer show

8  and that Denise wasn't going.  I just said I have no

9  reason to go, and I walked away.  I usually just

10  walked away from Jack when he made these comments to

11  me.

12    Q.    You didn't ask him to stop?

13    A.    No, I usually just walked away.

14    Q.    Did you ever joke back with Jack?

15          MR. BERNBACH:  Object to the question.

16          Joked back, who says he was joking?

17    Q.    Did you ever make any comments to Jack?

18    A.    Not of any sexual nature, no.

19    Q.    Did you ever send him any suggestive

20  e-mails?

21    A.    If I sent out any e-mails, they were sent

22  out to several people.  It wasn't anything specific.

23  I often sent out e-mails that customers sent to me

24  and I forwarded on to other people.

25    Q.    Did you ever forward any of them to Jack?

1  money?  How's that?

2          MS. DONNELLY:  Give me a few minutes.

3          (Brief recess at 3:47 p.m.)

4          (Time noted:  3:58 p.m.)

5      Q.    There are just a couple more questions

6  and I need you to identify some documents for me

7  because I don't know what they are.

8      A.    Okay.

9      Q.    With respect to commissions, did Jack

10  sell bikes as part of his job as owner?

11      A.    Sometimes he did.

12      Q.    Did he ever turn over the commissions on

13  any of those bikes to you?

14      A.    Yeah, if I helped with the deal.

15      Q.    Yes, if you worked with the deal?

16      A.    Yes, if I worked with the deal.

17      Q.    You also claim in the Complaint that

18  Wayne stole commissions from you?

19      A.    Uh-hum.

20      Q.    Can you identify, other than Hooks, any

21  customer that Wayne stole from you the commission

22  for?  That was very poorly phrased, I apologize.

23      A.    That's okay.

24          Dominic Campenello, which then at a later

25  time Jack did give me half of it.

294

1    Q.    Earlier you testified that you documented

2    your complaints against Wayne, is that correct?

3    A.    What do you mean?

4    Q.    We were talking about the complaints you

5    had against Wayne and you indicated that you had

6    written them on the calendar?

7    A.    Yes.

8    Q.    You said you also typed and hand wrote

9    issues regarding Wayne?

10    A.    Right.  This is the first part of it,

11    yeah.

12    Q.    So of the documents to which we were

13    referring --

14    A.    Yes.

15    Q.    There is nothing else you have in your

16    possession you have about complaints regarding

17    Wayne?

18    A.    No.

19    Q.    You only wrote down complaints about

20    Wayne?

21    A.    Right.

22    Q.    There is no similar document regarding

23    Jack?

24    A.    No.

25    (Document, Bates stamped P00116 is

303

1    there and I wanted to try to work things out and get

2    through it.

3            Q.    This --

4            A.    I know Wayne gave me backlash for this

5    note.  This one is a lot more incriminating.

6            .        MR. BERNBACH:  She was referring to D-42.

7            Q.    This was before, this wasn't the result

8    of that?

9            A.    No.

10           Q.    D-42 is not the result of D-43?

11           A.    No, I wrote this one first, but I think I

12   modified it down to this.

13           Q.    You had never given him the version

14   that's in D-43?

15           A.    No.

16           Q.    The problems during your employment at

17   New Roc were really with Wayne, weren't they?

18           A.·    No, they were Wayne and Jack.

19           Q.    You have substantial documentation with

20   your documents of Wayne?

21           A.    Yes.

22           Q.    And no documentation with your problems

23   with Jack, correct?

24           A.    Not written, but verbal with Patty, yes.

25           Q.    No written documentation --